**Joan Evans DALTON**

v.

**BOB NEILL PONTIAC, INCORPORATED.**

**Arnold Ray LOWERY and Sonja Wallace Lowery**

v.

**BOB NEILL PONTIAC, INCORPORATED.**

Nos. C-77-151-WS, C-77-237-WS.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

Aug. 20, 1979.

Herman L. Stephens, Stephens, Peed & Brown, Winston-Salem, N. C., for plaintiffs.

J. Robert Elster and W. R. Loftis, Jr., Hudson, Petree, Stockton, Stockton & Robinson, Winston-Salem, N. C., for defendant.

## MEMORANDUM OPINION

HIRAM H. WARD, District Judge.

The parties[1] have agreed that their above-entitled cases be tried by this Court, without a jury, on the pleadings, stipulated facts, and various exhibits.[2] This Memorandum Opinion shall include and constitute the findings of fact and conclusions of law mandated by Rule 52(a), Federal Rules of Civil Procedure.

---

1. The Dalton and Lowery cases were consolidated under Rule 42(a), Fed.R.Civ.P. *See* Initial Pre-Trial Conference Memorandum and Order, at 3 (filed Aug. 3, 1977).

2. *See* Stipulations of Facts (filed June 27, 1978). The plaintiffs and the defendant had earlier filed cross-motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P. *See* [Plaintiffs'] Motion for Summary Judgment (filed May 4, 1978); [Defendant's] Motion for Summary Judgment (filed May 8, 1978).

On August 26, 1976, plaintiff Joan Evans Dalton purchased a 1975 Pontiac Grand Safari automobile from defendant Bob Neill Pontiac, a company engaged in the retail sales of new and used cars. Dalton financed the automobile through the defendant, who thereafter transferred its interest to Forsyth Bank and Trust Company.[3] The defendant gave Dalton a copy of the car invoice on the day of the purchase. Part of the invoice showed the following:

| | |
|---|---|
| PRICE OF CAR | 5400.00 |
| OPTIONAL EQUIP. & ACCESS. | |
| SALES TAX | |
| LICENSE AND TITLE | 4.00 |
| TOTAL CASH PRICE | 5404.00 |
| FINANCING | 284.92 |
| INSURANCE | |
| TOTAL TIME PRICE | 5688.92 |
| SETTLEMENT: | |
| DEPOSIT | |
| CASH ON DELIVERY | 300.00 |
| TRADE-IN 73 Pontiac | 2909.00 |
| LESS LIEN | |
| TYPE Gr.Prix Cpe. | |
| M.V.I. SER. NO. 2K57T3A129555 | |
| PAYMENTS: | |
| 24 @ 103.33(9-25-76) Forsyth | 2479.92 |
| TOTAL | 5688.92 |

Along with the invoice, a copy of a Consumer Credit Agreement was given to plaintiff Dalton. Such Agreement, a portion of which is below,[4] constituted the disclosure statement required by the Truth-in-Lending Act, 15 U.S.C. § 1601 et seq.

| | |
|---|---|
| CASH PRICE | $ 5404.00 (1) |
| LESS DOWN PAYMENT | |
| CASH DOWN PAYMENT | $ 300.00 (2) |
| TRADE-IN CONSISTING OF: 1973 Pontiac | $ 2909.00 (3) |
| TOTAL DOWN PAYMENT (ADD 2 AND 3) | $ 3209.00 (4) |
| UNPAID BALANCE OF CASH PRICE (SUBTRACT 4 FROM 1) | $ 2195.00 (5) |
| PROPERTY INSURANCE CHARGE | $ n.a. (6) |

PROPERTY INSURANCE MAY BE OBTAINED THROUGH ANY PERSON DEBTOR CHOOSES. IF OBTAINED THROUGH SECURED PARTY OR ITS ASSIGNEE THE COST OF PROPERTY INSURANCE IS $ n.a.

| | |
|---|---|
| OTHER CHARGES (itemize) | $ n.a. (7) |
| | $ n.a. (8) |
| TOTAL OTHER CHARGES (ADD 7 AND 8) | $ n.a. (9) |
| ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE CHARGE | $ n.a. (10) |
| SUB-TOTAL (ADD 5, 6, 9, AND 10) USE CHART THIS AMOUNT | $ 2195.00 (11) |
| CREDIT LIFE INSURANCE CHARGE | $ n.a. (12) |
| ACCIDENT AND HEALTH INSURANCE CHARGE | $ n.a. (13) |

CREDIT LIFE, ACCIDENT AND HEALTH, AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE ARE NOT REQUIRED IN CONNECTION WITH THIS SALE. THE COST OF CREDIT LIFE INSURANCE IS $ n.a. THE COST OF ACCIDENT AND HEALTH INSURANCE IS $ n.a. THE COST OF ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE IS $ n.a. NO CHARGE IS MADE FOR CREDIT LIFE, ACCIDENT AND HEALTH, OR ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE, AND NO SUCH INSURANCE IS PROVIDED UNLESS THE DEBTOR SIGNS THE FOLLOWING STATEMENTS.
I desire credit life insurance for the cost shown in (12) above.

_____ (Date) _____ (Debtor's signature)
I desire accident and health insurance for the cost shown in (13) above.

_____ (Date) _____ (Debtor's signature)
I desire accidental death and dismemberment insurance for the cost shown in (10) above.

_____ (Date) _____ (Debtor's signature)

| | |
|---|---|
| UNPAID BALANCE (AMOUNT FINANCED) (ADD 11, 12 AND 13) | $ 2195.00 (14) |
| FINANCE CHARGE (TIME PRICE DIFFERENTIAL) | $ 284.92 (15) |
| TOTAL OF PAYMENTS AND TIME BALANCE (ADD 14 AND 15) | $ 2479.92 (16) |
| DEFERRED PAYMENT PRICE (ADD 1, 6, 9, 10, 12, 13, AND 15) | $ 5688.92 (17) |
| ANNUAL PERCENTAGE RATE | 12.00 % |

The "cash price" of $5,404.00 was listed on both the invoice and the disclosure statement. This price included $4.00 for license and title fees ($2.00 for transfer of tag and $2.00 for transfer of title). These fees were not retained by defendant but were paid to the North Carolina Department of Motor Vehicles. Although the invoice indicated that these fees were part of the cash price, the disclosure statement did not. The finance charge of $284.92 imposed in this transaction did not include the license and title fees.

Dalton filed suit against Bob Neill Pontiac on March 31, 1977, claiming that the

---

3. The parties do not dispute that the defendant is a creditor under the Truth-in-Lending Act. The relationship between defendant Bob Neill Pontiac and Forsyth Bank and Trust Company was apparently arranger of credit and extender of credit. As this Court noted in *Jennings v. Edwards*, 454 F.Supp. 770, 772 (M.D.N.C.1978), aff'd, 598 F.2d 614 (4th Cir. 1979) (Table), "[i]n a typical situation, the arranger [of credit] is a seller of merchandise or services who arranges for credit to be extended to its customer, and the extender [of credit] is a bank or finance company which actually extends the credit to the customer. [citations omitted] In these situations, the seller often assigns the contract it has with its customer to a bank or finance company." There is no evidence before the Court as to the relationship between defendant and Forsyth Bank.

4. The figures have been retyped for legibility. The copy presented to the Court could not be reproduced satisfactorily.

failure of individually itemizing on the disclosure statement the charges for license and title fees as part of the amount financed violated the Truth-in-Lending Act.[5] She sought damages of $577.84.

On May 22, 1976, plaintiffs Arnold Ray Lowery and wife Sonja Wallace Lowery purchased a 1976 Pontiac Catalina automobile from Bob Neill Pontiac. The Lowerys financed the car through the defendant.[6] They were given a copy of the car invoice, which indicated the following:

| PRICE OF CAR | 6068.00 |
|---|---|
| OPTIONAL EQUIP. & ACCESS. | |
| | |
| SALES TAX | 120.00 |
| LICENSE AND TITLE | 13.75 |
| TOTAL CASH PRICE | 6201.75 |
| MIC | 105.00 |
| A. & H. | 280.91 |
| FINANCING | 1282.81 |
| INSURANCE Life | 221.77 |
| TOTAL TIME PRICE | 8092.24 |
| SETTLEMENT: | |
| DEPOSIT | |
| CASH ON DELIVERY | 700.00 |
| TRADE-IN | |
| LESS LIEN | |
| TYPE M.V.I. SER. NO. | |
| PAYMENTS: 36 @ 205.34(6-19-76) Forsyth | 7392.24 |
| TOTAL | 8092.24 |

A copy of the disclosure statement was also given to them, part of which provided:

| | |
|---|---|
| CASH PRICE | $6201.75 (1) |
| LESS DOWN PAYMENT CASH DOWN PAYMENT | $ 700.00 (2) |
| TRADE-IN CONSISTING OF: | $ n.a. (3) |
| TOTAL DOWN PAYMENT (ADD 2 AND 3) | $ 700.00 (4) |
| UNPAID BALANCE OF CASH PRICE (SUBTRACT 4 FROM 1) | $5501.75 (5) |
| PROPERTY INSURANCE CHARGE | $ 105.00 (6) |
| PROPERTY INSURANCE MAY BE OBTAINED THROUGH ANY PERSON DEBTOR CHOOSES. IF OBTAINED THROUGH SECURED PARTY OR ITS ASSIGNEE THE COST OF PROPERTY INSURANCE IS $105.00 | |
| OTHER CHARGES (Itemize) | $ n.a. (7) |
| | $ n.a. (8) |
| TOTAL OTHER CHARGES (ADD 7 AND 8) | $ n.a. (9) |
| ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE CHARGE | $ n.a. (10) |
| SUB TOTAL (ADD 5, 6, 9, AND 10) USE CHART THIS AMOUNT | $6606.75 (11) |
| CREDIT LIFE INSURANCE CHARGE | $ 221.77 (12) |
| ACCIDENT AND HEALTH INSURANCE CHARGE | $ 280.91 (13) |

CREDIT LIFE, ACCIDENT AND HEALTH, AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE ARE NOT REQUIRED IN CONNECTION WITH THIS SALE. THE COST OF CREDIT LIFE INSURANCE IS $221.77 THE COST OF ACCIDENT AND HEALTH INSURANCE IS $280.91 THE COST OF ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE IS $n.a. NO CHARGE IS MADE FOR CREDIT LIFE, ACCIDENT AND HEALTH, OR ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE, AND NO SUCH INSURANCE IS PROVIDED UNLESS THE DEBTOR SIGNS THE FOLLOWING STATEMENTS. I desire credit life insurance for the cost shown in (12) above.

5/20-76 s/ARNOLD RAY LOWERY
(Date) (Debtor's signature)
I desire accident and health insurance for the cost shown in (13) above.

5/20-76 s/ARNOLD RAY LOWERY
(Date) (Debtor's signature)
I desire accidental death and dismemberment insurance for the cost shown in (10) above.

(Date) (Debtor's signature)

| | |
|---|---|
| UNPAID BALANCE (AMOUNT FINANCED) (ADD 11, 12 AND 13) | $6109.43 (14) |
| FINANCE CHARGE (TIME PRICE DIFFERENTIAL) | $1282.81 (15) |
| TOTAL OF PAYMENTS AND TIME BALANCE (ADD 14 AND 15) | $7392.24 (16) |
| DEFERRED PAYMENT PRICE (ADD 1, 6, 9, 10, 12, 13, AND 15) | $8092.24 (17) |
| ANNUAL PERCENTAGE RATE | 12.83 % |

$6,201.75 was listed as the "cash price" on both the invoice and the disclosure statement. Included in this amount was $13.75 for license and title fees which was paid to the North Carolina Department of Motor Vehicles ($11.75 for issuance of tag and $2.00 for certificate of title). The invoice specified that these fees were part of the cash price, but there was no such indication on the disclosure statement. These fees were not included in the finance charge of $1,282.81.

The Lowerys bought another car from defendant, a 1977 Pontiac Grand Safari Wagon, on March 31, 1977. This purchase was financed in the same manner as their first car, through the defendant, who gave them a disclosure statement along with a car invoice. The cash price was listed on both the disclosure statement and the invoice as $7,700.00, although only the invoice indicated that this amount included $4.00 for license and title fees which was paid to

5. At the time that Joan Dalton filed suit she was a secretary for a law firm which has represented many plaintiffs in Truth-in-Lending actions. However, she did buy the Pontiac before she began working for the law firm.

6. Defendant transferred its interest to Forsyth Bank and Trust Company, using the same method as in *Dalton*. See n.3 *supra*.

the Department of Motor Vehicles. Part of the invoice is shown below:

| DATE | INVOICE NO. | STOCK NO. |
|---|---|---|
| 3/31/77 | 767 03240 | |
| | SALESMAN NUMBER | |

| DESCRIPTION | | SALE | |
|---|---|---|---|
| NEW CAR-PONTIAC | | 7,576 | 00 |
| | -LEMANS | | |
| | -FIREBIRD | | |
| | -GRAND PRIX | | |
| P | -VENTURA | | |
| R | -ASTRE | | |
| I | -SUNBIRD | | |
| C | -MERCEDES | | |
| E | | | |
| O | INVENTORY-NEW CARS | | |
| F | | | |
| | USED CARS-RETAIL | | |
| C | -WHOLESALE | | |
| A | | | |
| R | | | |
| | SALES TAX | 120 | 00 |
| | LICENSE AND TITLE | 4 | 00 |
| | **TOTAL CASH PRICE** | **7,700** | **00** |
| | FINANCING | 1,439 | 98 |
| | INSURANCE MIC Life | 699 | 94 |
| | **TOTAL TIME PRICE** | **9,839** | **92** |
| S | CUSTOMER DEPOSIT | 245 | 30 |
| E | CASH ON DELIVERY | 254 | 70 |
| T | | | |
| T | | | |
| L | | | |
| E | USED CAR ALLOWANCE | 1,043 | 00 |
| M | PAYMENTS | | |
| E | MONTHS DOLLARS | | |
| N | 36 230.47 PER MONTH | 8,296 | 92 |
| T | 4/30/77 TOTAL | 9,839 | 92 |

Part of the disclosure statement is below:

```
CASH PRICE ............................................ $ 7,700.00 (1)
LESS DOWN PAYMENT
 CASH DOWN PAYMENT _____ $ 500.00 (2)
 TRADE-IN
 CONSISTING OF 1976 Pontiac $ 1043.00 (3)
TOTAL DOWN PAYMENT (ADD 2 AND 3) _____ $ 1543.00 (4)
UNPAID BALANCE OF CASH PRICE (SUBTRACT 4 FROM 1) _ $ 6157.00 (5)
PROPERTY INSURANCE CHARGE _____ $ 154.00 (6)
 PROPERTY INSURANCE MAY BE OBTAINED THROUGH ANY PERSON
 DEBTOR CHOOSES. IF OBTAINED THROUGH SECURED PARTY OR ITS
 ASSIGNEE THE COST OF PROPERTY INSURANCE IS $ 154.00
OTHER $ n.a.
CHARGES (Itemize) _____ (7)
 $ n.a. (8)
TOTAL OTHER CHARGES (ADD 7 AND 8) _____ $ n.a. (9)
ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE CHARGE _ $ n.a. (10)
SUB TOTAL (ADD 5, 6, 9, AND 10) USE CHART THIS AMOUNT _ $ 6311.00 (11)
CREDIT LIFE INSURANCE CHARGE _____ $ 199.13 (12)
ACCIDENT AND HEALTH INSURANCE CHARGE _____ $ 346.81 (13)
 CREDIT LIFE, ACCIDENT AND HEALTH, AND ACCIDENTAL DEATH AND DISMEMBERMENT
 INSURANCE ARE NOT REQUIRED IN CONNECTION WITH THIS SALE. THE COST OF CREDIT
 LIFE INSURANCE IS $ 199.13 . THE COST OF ACCIDENT AND HEALTH INSURANCE
 IS $ 346.81 . THE COST OF ACCIDENTAL DEATH AND DISMEMBERMENT INSUR-
 ANCE IS $ n.a. . NO CHARGE IS MADE FOR CREDIT LIFE, ACCIDENT AND
 HEALTH, OR ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE, AND NO SUCH
 INSURANCE IS PROVIDED UNLESS THE DEBTOR SIGNS THE FOLLOWING STATEMENTS.
I desire credit life insurance for the cost shown in (12) above.
 3/31/77 s/ARNOLD RAY LOWERY
 (Date) (Debtor's signature)
I desire accident and health insurance for the cost shown in (13) above.
 3/31/77 s/ARNOLD RAY LOWERY
 (Date) (Debtor's signature)
I desire accidental death and dismemberment insurance for the cost shown in (10) above.

 (Date) (Debtor's signature)
UNPAID BALANCE (AMOUNT FINANCED) (ADD 11, 12 AND 13) _ $ 6856.94 (14)
FINANCE CHARGE (TIME PRICE DIFFERENTIAL) _____ $ 1439.98 (15)
TOTAL OF PAYMENTS AND TIME BALANCE (ADD 14 AND 15) _ $ 8296.92 (16)
DEFERRED PAYMENT PRICE (ADD 1, 6, 9, 10, 12, 13, AND 15) _ $ 9839.92 (17)
ANNUAL PERCENTAGE RATE _____ 12.83 %
```

7. The Lowerys are no strangers to Truth-in-Lending. They filed a suit in state court which was affirmed on appeal, *Lowery v. Finance America Corp.*, 32 N.C.App. 174, 231 S.E.2d

·The finance charge of $1,439.98 did not include the $4.00 for license and title fees.

The Lowerys filed suit against the defendant car dealer on May 19, 1977, alleging that the Truth-in-Lending Act had been violated when the charges for license and title fees were not itemized on the two disclosure statements referred to above.[7] They sought damages of $2,000.00.

This Court must determine whether the defendant violated the Truth-in-Lending Act by including the license and title fees in the cash price on the disclosure statement and by failing to itemize such fees on the statement.

■ The transactions involved in these cases were consumer credit sales, see 15 U.S.C. § 1602(g) & (h); 12 C.F.R. § 226.2(p) & (t), and they were not under an open end credit plan. See 15 U.S.C. § 1602(i); 12 C.F.R. § 226.2(x). The Truth-in-Lending Act provides in part that in such a sale:

the creditor shall disclose . . . . :

(1) The cash price of the property or service purchased.

· · · · ·

(4) All other charges, individually itemized, which are included in the amount of the credit extended but which are not part of the finance charge.

\* \* \* \* \* \*

(6) . . . [T]he amount of the finance charge . . . .

15 U.S.C. § 1638(a).

The defendant did disclose a cash price on the Consumer Credit Agreements which constituted the disclosure statements. The defendant apparently believed that it was natural to include license and title fees as part of the total cash price. See copies of invoices *supra*. Such inclusion is not unreasonable from a business and practical standpoint. However, Regulation Z defines "cash price" as:

904 (1977), and filed another suit in the United States District Court for the Middle District of North Carolina, *Lowery v. Parks Chevrolet, Inc.*, No. C–77–312–WS.

the price at which the creditor offers, in the ordinary course of business, to sell for cash the property or services which are the subject of a consumer credit transaction. It may include the cash price of accessories or services related to the sale such as delivery, installation, alterations, modifications, and improvements, and may include taxes to the extent imposed on the cash sale, *but shall not include any other charges of the types described in § 226.4.*

12 C.F.R. § 226.2(n) (emphasis added).

Section 226.4 of Regulation Z is entitled "Determination of finance charge." Subsection (a) lists eight "types of charges" to be included in the finance charge. Subsection (b) lists four types of charges which need not be included in the finance charge if itemized. In this group are "[l]icense, certificate of title, and registration fees imposed by law." 12 C.F.R. § 226.4(b)(4). These latter fees are precisely the kind involved in the present cases. A literal reading of § 226.2(n) compels the conclusion that such license and title fees may not be included in the cash price for purposes of the Truth-in-Lending Act, because such fees are "charges of the types described in § 226.4."

It has been argued that the reference to § 226.2(n) means only such charges that are "true" finance charges, *i. e.,* "charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor *as an incident to the extension of credit . . .*" 15 U.S.C. § 1605(a) (emphasis added). Since the statutorily-required license and title fees would have been imposed regardless of whether plaintiffs paid in cash or on credit, the fees were not imposed as an incident to the extension of credit. According to the argument, because such fees do not meet the general definition of "finance charge," the reference in § 226.2(n) to the exclusion of § 226.4 charges is inapplicable, and the fees can therefore be included in the cash

price. The Court cannot accept such an argument.

■ Congress did not intend to confine finance charges to charges for credit. The definition of finance charge in the Act is prefaced by the phrase "[e]xcept as otherwise provided in this section . . . ." 15 U.S.C. § 1605(a). In the same section on "Determination of finance charge," it is provided that:

If any of the following items is itemized and disclosed in accordance with the regulations of the Board in connection with any transaction, then the creditor need not include that item in the computation of the finance charge with respect to that transaction:

. . . . .

(4) Any other type of charge which is *not for credit* and the exclusion of which from the finance charge is approved by the Board by regulation.

15 U.S.C. § 1605(d) (emphasis added).

The obvious converse of § 1605 is that if the item is *not* itemized and disclosed, then the creditor *needs* to include that item in the computation of the finance charge. Therefore, Congress has approved the rather incongruous method of including in the finance charge charges which are not for credit.

■ It is clear from Regulation Z, § 226.-4(b) that license and title fees are to be itemized and disclosed. As mentioned above, the regulation states that "[i]f itemized and disclosed to the customer, any charges of the following types need not be included in the finance charge: . . . (4) License, certificate of title, and registration fees imposed by law." 12 C.F.R. § 226.4(b). As with § 1605(d), the obvious converse is if license and title fees are *not* itemized and disclosed, then they need to be included in the finance charge.

The necessity of itemizing license and title fees is further strengthened by the

requirement of 15 U.S.C. § 1638(a)(4) to disclose "[a]ll other charges, individually itemized, which are included in the amount of the credit extended but which are not part of the finance charge." *See also* 12 C.F.R. § 226.8(c)(4). Because license and title fees cannot be included in cash price, *see* discussion *supra,* and if they are not included in the finance charge but are included in the amount of the credit extended (amount financed), then they must be individually itemized.

A number of cases have held or stated that license and title fees must be itemized and disclosed and that they are not to be included in the cash price.[8] *Meyers v. Clearview Dodge Sales, Inc.,* 539 F.2d 511, 517–19 (5th Cir. 1976), *aff'g* 384 F.Supp. 722, 725 (E.D.La.1974); *Childs v. Ford Motor Credit Co.,* 470 F.Supp. 708, 712 (N.D. Ala.1979); *Smith v. Lewis Ford, Inc.,* 456 F.Supp. 1138, 1142–44 (W.D.Tenn.1978) (good discussion); *Souife v. First National Bank of Commerce,* 452 F.Supp. 818, 822 (E.D.La.1978); *Perkins v. Don Ford Auto Sales, Inc.,* CCH Consumer Credit Guide ¶ 98,515 (W.D.Ky.1975); *Allen v. City Dodge, Inc.,* CCH Consumer Credit Guide ¶ 98,428 (N.D.Ga.1975); *McKinney v. Greenbriar Lincoln-Mercury, Inc.,* CCH

Consumer Credit Guide ¶ 98,552 (N.D.Ga. 1975);[9] *Starks v. Orleans Motors, Inc.,* 372 F.Supp. 928, 932 (E.D.La.1974), *aff'd,* 500 F.2d 1182 (5th Cir. 1974) (Table); *Walker v. Security Trust Co. of Rochester,* 85 Misc.2d 614, 616–617, 379 N.Y.S.2d 308, 311–12 (N.Y.Sup.Ct.1976). An unpublished opinion by Chief Judge Gordon of this Middle District is in accord with these cases, holding that the Act was violated when license and title fees were not itemized but were included in the cash price. *Bolick v. High Point Datsun Sales, Inc.,* No. C–77–251–G (M.D.N.C. Aug. 10, 1978).

Furthermore, several opinion letters of the Federal Reserve Board staff indicate the necessity of itemizing or including in the finance charge license and title fees *imposed by law.* FRB Letter No. 623 (Aug. 9, 1972), CCH Consumer Credit Guide ¶ 30,-872; FRB Letter No. 330 (May 21, 1970), CCH Consumer Credit Guide ¶ 30,385.[10] Such F.R.B. staff interpretations are entitled to great deference. *Johnson v. McCrackin-Sturman Ford, Inc.,* 527 F.2d 257, 267 (3d Cir. 1975); *Philbeck v. Timmers Chevrolet, Inc.,* 499 F.2d 971, 977 (5th Cir. 1974). *But see St. Germain v. Bank of Hawaii,* 573 F.2d 572, 576–77 (9th Cir. 1977).

8. Only one case could be found holding that title fees could permissibly be included in the cash price: *St. Germain v. Bank of Hawaii,* 413 F.Supp. 587 (D.Haw.1976), *rev'd on other grounds,* 573 F.2d 572 (9th Cir. 1977) (appellate decision contained no discussion of issue). This Court cannot accept the *St. Germain* reasoning and decision. *See Smith v. Lewis Ford, Inc.,* 456 F.Supp. 1138, 1143 (W.D.Tenn.1978).

9. In his well-reasoned and well-researched manual, Ralph C. Clontz, Jr., examines the Truth-in-Lending Act from a practical and sensible viewpoint, attempting to interpret and apply the Act with an eye on reality. He is not adverse to criticizing the Act, Regulations, or the courts. Even Mr. Clontz has opined that *McKinney* "properly held that license, title, and registration fees are required [to be] included in the total finance charge where they are not itemized." 1 R. Clontz, *Truth-in-Lending Manual* ¶ 2.04[7][b] (4th Ed. 1976).

10. *But cf.* FRB Letter No.60 (Aug. 7, 1969), CCH Consumer Credit Guide ¶ 30,123; FRB

Letter No.482 (May 28, 1971), CCH Consumer Credit Guide ¶ 30,702; Unnumbered FRB Letter of Jan. 23, 1973, CCH Consumer Credit Guide ¶ 30,935. These letters indicate that when documentary fees are not imposed as an incident to the extension of credit, they are not to be considered finance charges because they do not meet the general test of a finance charge. However, Regulation Z, § 226.4(b) does not mention such documentary fees; it does mention license and title fees. Although the Court recognizes the inconsistency between several FRB staff opinion letters as to the treatment of documentary fees, *compare* FRB Letter No.60 (itemize under § 226.8(c)(4)) *with* FRB Letter 330 (may include in cash price); *see* 1 R. Clontz, *Truth-in-Lending Manual* ¶ 2.04[7][a] (4th Ed. 1976); the *Dalton* and *Lowery* cases do not involve documentary fees. Documentary fees are fees charged by an automobile dealer for preparing various documents relating to the sale of an automobile, such as license and title applications. These documentary fees are to be distinguished from fees imposed by law. *See* FRB Letter 330 (May 21, 1970).

■ The defendant argues that Regulation Z, to the extent it requires itemization of license and title fees or their inclusion in the finance charge, is not reasonably related to the purposes of the Truth-in-Lending Act and is therefore violative of the Fifth Amendment to the United States Constitution. The Court reluctantly disagrees.

The Truth-in-Lending Act empowers the Federal Reserve Board to "prescribe regulations to carry out the purposes" of the Act. 15 U.S.C. § 1604. "The standard to be applied in determining whether the Board exceeded the authority delegated to it under the Truth in Lending Act is well established . . . . [T]he validity of a [Board] regulation promulgated . . . [under the Act] will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660–61, 36 L.Ed.2d 318, 329–30 (1973).

> The Act itself announces its purpose: The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this title to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit. . . .
> 15 U.S.C. § 1601(a).

*See White v. Arlen Realty & Development Corp.*, 540 F.2d 645, 650 (4th Cir. 1975).

The Truth-in-Lending Act concerns, of course, *credit*, and Congress desired that there be a meaningful disclosure of *credit*

*terms.* The license and title fees in the present cases, however, were not imposed as an incident to the extension of credit; they would have been imposed whether plaintiffs paid in cash or on credit. The Banking and Currency Committee's report on the Act explained that:

> by requiring all creditors to disclose credit information . . . and by requiring all additional *mandatory charges* imposed by the creditor *as an incident to credit* be included in the computation of the applicable percentage rate, the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit.
>
> House Report No.1040, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News pp. 1962, 1970–71 (emphasis added).

It is difficult to discern any importance in requiring itemization of license and title fees for purposes of "comparison shopping" for credit. The Federal Reserve Board itself has recommended that § 226.4(b)(4) be deleted from the Regulations, noting that "§ 226.4(b) anomalously singles out these [license, certificate of title, and registration] fees [imposed by law] for special treatment, with *no apparent consumer benefit.*" Order of Board of Governors of the Federal Reserve System (May 3, 1977), 1 CCH Consumer Credit Guide ¶ 3519 (1978) (emphasis added).

On the other hand, license and title fees are often included in the amount financed (as in the present cases), and although such fees are minute in amount, their itemization would inform the consumer-borrower of what he or she is financing. Itemization of the fees may be petty, but it is not absolutely meaningless.[11] Any doubt as to § 226.4(b)(4)'s validity must be resolved in

---

11. It should be noted that the Federal Reserve Board in the same order in which it proposed deletion of § 226.4(b)(4), see text above, commented that "if these [license, certificate of title, and registration] fees [imposed by law]

are financed by the creditor, rather than paid in cash, they must be itemized and disclosed as a part of the amount financed." 1 CCH Consumer Credit Guide ¶ 3519.

its favor because of the Act's specific reference to itemization of charges not for credit in 15 U.S.C. § 1605(d). As has already been noted, see page 794 *supra*, the statute provides that "[i]f . . . itemized . . the creditor need not include . . . in . . . the finance charge . . . [a]ny other type of *charge* which is *not for credit* and the *exclusion* of which from the finance charge *is approved by the Board by regulation.*" (emphasis added). Section 226.4(b) is such a regulation, authorized by the statute. Therefore, this Court cannot conclude that Regulation Z, § 226.4(b)(4) violates the Fifth Amendment to the United States Constitution.

▆▆▆▆ The defendant in the present cases did itemize the license and title fees on the invoices which were given to plaintiffs at the same time they received the Consumer Credit Agreements. However, Regulation Z clearly and specifically requires that "[a]ll of the disclosures shall be made together on either: (1) The note or other instrument evidencing the obligation *on the same side of the page* and above or adjacent to the place for the customers signature; or (2) *One side* of a separate statement which identifies the transaction." 12 C.F.R. § 226.8(a) (emphasis added). Numerous F.R.B. staff letters have noted this requirement, FRB Letter No.825 (July 31, 1974); FRB Letter No.537 (Oct. 27, 1971); FRB Letter No.150 (Oct. 14, 1969); FRB Letter No.130 (Oct. 7, 1969); FRB Letter No.25 (July 2, 1969); as has *Gennuso v. Commer-*

*cial Bank & Trust Co.*, 566 F.2d 437, 441–42 (3d Cir. 1977). *See also Charles v. Krauss Co., Ltd.*, 572 F.2d 544, 548 (5th Cir. 1978). Therefore, itemization of the fees on the invoice does not constitute compliance with Regulation Z.[12] The Court concludes that defendant violated the Truth-in-Lending Act, 15 U.S.C. § 1605(d)(4), and Regulation Z, 12 C.F.R. § 226.4(b)(4), by failing to itemize the license and title fees on the disclosure statements and by not including them in the finance charges.

▆▆▆▆ If this Court were to impose the statutory penalties, Dalton would receive $577.84 for defendant's failure to itemize a $4.00 fee, and the Lowerys would receive $2,000.00 for defendant's failure to itemize $17.75 in fees![13] Such a result would be shocking and contrary to settled notions of fairness and equity. The large penalties have no reasonable correlation with the extremely minor and technical violations. The plaintiffs' attorney admitted at the hearing that his clients had suffered *no actual harm*. The defendant did not deceive or mislead the plaintiffs with regard to the license and title fees. The plaintiffs well knew that they were paying for such fees; they had been given invoices indicating the charge for the fees. Inclusion of the fees in the cash price is clearly understandable from a business and practical point of view. Whether the license and title fees were correctly itemized had no effect on plaintiffs' decisions to purchase the automobiles or to finance them through

---

**12.** The Court must reject defendant's argument that the principles of estoppel should prevent plaintiffs from prevailing in this case since they knew about the license and title fees from the invoices. It is true that the invoices did clearly notify plaintiffs of the license and title fees, that the plaintiffs should have known about such fees, and that they were not misled or deceived by the defendant. However, Section 226.8(a) of Regulation Z cannot be nullified by resort to estoppel or other equitable principles under the present circumstances. The Court notes there is no evidence indicating any of the plaintiffs *knew at the time* of the transactions that a specific violation of the Truth-in-Lending Act or Regulation Z was occurring.

**13.** *See* page 801 *infra*.

The defendant argues that imposition of such penalties violates the Eighth Amendment's prohibition against "excessive fines." The Eighth Amendment is applicable to those convicted of crimes, *Bell v. Wolfish*, —— U.S. ——, 99 S.Ct. 1861, 60 L.Ed.2d 447, 466 n.16 (1979); *Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d 711, 725 (1977); it is not applicable to civil penalties. *Zwick v. Freeman*, 373 F.2d 110, 119 (2d Cir. 1967); *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957). Although the result in the present cases borders on the unconscionable, it is not sufficient to invoke substantive due process.

the defendant. By these lawsuits, the plaintiffs simply seek a windfall.

The Truth-in-Lending Act has a laudible purpose: to allow consumers to become more knowledgeable and informed in their use of credit. With knowledge comes fairer treatment of the consumer. However, the Act becomes tarnished when it is used to reach a flagrantly inequitable result. The cases presently before the Court are excellent examples of how the Act can be abused. They are also examples of how the Act and Regulation Z set themselves up for abuse and how they can hinder the ends of justice. Any law which allows such result should be re-examined.

This Court is certainly not the first to levy criticism on the Truth-in-Lending Act or to comment on the potential and actual abuse of the Act by plaintiffs. Judge Chapman of the United States District Court for the District of South Carolina is a vocal and expressive critic of some aspects of the Act, and much of his statement in *Wilson v. Allied Loans, Inc.*, 448 F.Supp. 1020, 1022–23 (D.S.C.1978), is applicable to the present cases:

> Despite the fact that this Court feels compelled by the statutes and regulations to award the plaintiff the penalty established by the Truth in Lending Act, this *result is absurd in light of the realities of* this case. *This barratrous legislation transforms loan documents into contest puzzles in which prizes are awarded to those who can uncover the technical defects.* Unfortunately, these prizes are not paid by the sponsor of the contest, the government, but by finance companies who attempt to make a fair profit by loaning money while at the same time trying to insure that the loans will be repaid. They must necessarily use form documents which are sufficiently flexible to cover a wide variety of situations presented by both consumer and commer-

cial loans. A penalty is imposed on the defendant in this case even though it has acted in good faith and despite the fact that plaintiff has sustained no damages. . The violation in this case results from a minor technicality which arises from the operation of the 10 day rule relating to after-acquired security interest in consumer goods. The 10 day interest acquired was surely unwanted by the defendant, unimportant to the plaintiff, and unexpected by both parties. It gave no meaningful security to the defendant and its full disclosure to the plaintiff would undoubtedly have had no effect on plaintiff's decision to obtain the loan from the defendant.

(emphasis added).

Judge Chapman has also noted:

> Unfortunately, *many* of the truth in lending *cases* which have been instituted in this court *have not been brought by plaintiffs who were misled or misinformed* by the loan forms they attack. These *plaintiffs have merely sought a windfall penalty* from a lender by picking apart its loan form word by word in search of a technical deviation from the language of the statutes and regulations. The Truth in Lending Act was never meant to make the district courts forums for word games between lenders and borrowers in which a borrower's attorney who is adept at using legalese and arguing technicalities is awarded a prize for himself and his client. In order to avoid such misuse of the Truth in Lending Act, this Court will strongly construe its provisions against borrowers who were not misled by a lender's disclosure but merely seek a penalty for finding a technical problem with the loan form which could not have conceivably influenced his choice of credit.

*Sanders v. Auto Associates, Inc.*, 450 F.Supp. 900, 902 (D.S.C.1978). (emphasis added).[14]

---

**14.** Judge Chapman has labeled some plaintiffs' actions as "profit making ventures":

This Court intends, as a matter of judicial policy, to deny all requests for in forma pau-

One Court has observed that "'the obvious intent of Congress was to set standards by which to achieve meaningful 'truth-in-lending' and not to deviously set traps by which windfalls could be reaped by fanciful lawyers.'" *Andrucci v. Gimbel Brothers, Inc.*, 365 F.Supp. 1240, 1243 (W.D.Pa.1973), *aff'd*, 505 F.2d 729 (3d Cir. 1974) (Table). Another court has remarked that "[i]t appears to be all too easy, in the light of some reported cases, for courts to abdicate the realm of reality. . . . [C]ourts should not condone or give credence to suits which attempt to subvert the Act into an instrument of harassment and oppression of the lending industry." *Sharp v. Ford Motor Credit Co.*, 452 F.Supp. 465, 468 (S.D.Ill. 1978). *Accord, Augusta v. Marshall Motor Co.*, 453 F.Supp. 912, 914 (N.D.Ohio 1977). In the same vein is the comment in *Shields v. Valley National Bank of Arizona*, 56 F.R.D. 448, 451 (D.Ariz.1971):

> At a time when large business firms in general appear to be a scapegoat for a great many of our Nation's problems, the Courts should not gratuitously add the final straw. The Truth-in-Lending Act has laudible purposes and should be strictly enforced by the Courts, but it should not be allowed to be used as means of oppression or harassment or unjust enrichment.

As to non-judicial criticism, *see* J. Edmonds & G. Taylor, *Truth and Consequences*, 35 Wash. & Lee Law Rev. 367 (1978), wherein the authors concluded:

> Truth-in-Lending was a well-intended statute. Unfortunately, it seems to serve mostly as a trap for the unwary creditor, increasing the cost of credit extensions and eliminating the small credit extender from the market as opposed to achieving

benefits for the consumers on whose behalf it was enacted. Consumers have gotten windfalls because of creditors' errors, some of which were unintentional and meaningless. This is not exactly the policy of benefiting consumers attributed to Congress when it enacted this legislation.

35 Wash. & Lee L.Rev. at 391.[15]

The Board of Governors of the Federal Reserve System, the body responsible for implementing Regulation Z, noted the criticism in its annual report to Congress for the year 1976:

> During the nearly 7 years that the Truth in Lending Act has been in effect, the Board has become aware of considerable criticism of the Act and of Regulation Z because of their complexity. Critics have argued not only that the numerous technical disclosures are burdensome for creditors but also that the disclosure statement is so lengthy and complicated that most consumers do not bother to read it. The criticism concludes that, in attempting to give consumers all the meaningful information they need to make an informed credit decision, Truth in Lending legislation has gone too far and, in many cases, has only confused consumers with extraneous information not directly related to the costs of credit.

> The Board has been concerned with the complexity of the Act and of Regulation Z for some time and has, in the past, made recommendations aimed at simplification of the Act's disclosure requirements. The Board feels that continued attention to simplification efforts is desirable.

Federal Reserve Board Recommendations to Congress, from Annual Report to Con-

---

peris status from plaintiffs who come to this court seeking, not to recover damages, but to make a profit. If a plaintiff wants to use the Truth-in-Lending Act to make such a profit at the expense of the lender, this Court expects her to pay the filing fees and service costs as her initial investment in the profit making venture.

*Leverett v. Bishop Furniture Co.*, 451 F.Supp. 289, 293 (D.S.C.1978).

**15.** The authors stated that the title initially proposed for the article was "The Truth Shall Make You a Fee." 35 Wash. & Lee L.Rev. at 367. The Truth-in-Lending Act has been referred to by others as the "Lawyers' Relief Act." There is some truth in that.

gress on Truth-in-Lending for the Year 1976 by the Board of Governors of the Federal Reserve System, CCH Consumer Credit Guide, pamphlet, issue no. 434, part II, appendix C, at 37 (Jan. 28, 1977).

The Board admitted last year that:

Amendments to the Truth in Lending Act, and interpretations by the courts, have made compliance increasingly difficult. Also, Regulation Z, in providing detailed guidance to creditors, has introduced its own complexity to Truth in Lending. Concerns have arisen about the intelligibility and usefulness of current Truth in Lending disclosures to the average consumer, as well as about the possibility that excessive complexity is indirectly increasing the cost of credit to consumers.

Annual Report to Congress on Truth-in-Lending for the Year 1978 by the Board of Governors of the Federal Reserve System, CCH Consumer Credit Guide, pamphlet, issue no. 539, part II, at 1 (Jan. 25, 1979).

Much of the above criticism is directed toward the Act's complexity and the resulting uncertainty of the disclosure requirements, whereas the cases presently before this Court involve a disclosure requirement which is not uncertain. As noted at pp. 794–795 *supra*, such requirement is rather obvious. The major criticism in these cases centers around the potential liability of the defendant for a purely technical and minor violation. The Federal Reserve Board has also addressed this problem:

Much of the present complexity of the Act and Regulation Z reflects the impact of the civil liability considerations. The threat of *severe penalties for relatively minor technical violations* has led many creditors to seek greater certainty by requesting official Board amendments and interpretations, which further complicate the regulation. Although private causes of action provide an important enforcement tool for the Act, the Board believes that Congress should carefully review the present civil liability provisions to deter-

mine whether modification in them might reduce needless litigation and the resulting regulatory complications.

. . . . .

[T]he Board urges that Congress also study the possibility of *limiting the penalty provisions* of the statute to violations that actually interfere with the consumer's ability to make meaningful comparisons of credit terms. Only a limited number of terms seem to be genuinely helpful in this regard. These probably include the annual percentage rate, the finance charge, the amount financed, and the repayment schedule. It may be that *civil liability should be incurred only for material misstatements of these terms*, leaving technical violations to be dealt with by administrative remedies. *Under present law a creditor may be penalized for purely technical violations of which the consumer may have been unaware at the time and which in no way entered into the decision to accept or reject the credit terms offered. This situation lends itself to abuse and has overburdened some courts with Truth in Lending litigation.*

Federal Reserve Board Letter to Congress on Recommendations for Amendments of Truth-in-Lending Act (dated July 16, 1976), CCH Consumer Credit Guide, pamphlet, issue no. 434, part II, appendix D, at 39 & 40 (Jan. 28, 1977) (emphasis added).

■ This Court must now decide whether it will impose liability on the defendant for the minor technical violations. The Truth-in-Lending Act provides that:

any creditor who fails to comply with any requirement imposed under this [Act] . . . with respect to any person is liable to such person in an amount equal to the sum of

(1) any actual damage sustained by such person as a result of the failure;

(2) (A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction . . ., except that the liabili-

ty under this subparagraph shall not be less than $100 nor greater than $1,000

. . . . .

15 U.S.C. § 1640(a).

This penalty provision is applicable to violations of both the Act and Regulation Z. *Mourning v. Family Publications Service*, 411 U.S. 356, 376 n. 41, 93 S.Ct. 1652, 36 L.Ed.2d 318, 333 n. 41 (1973); *Walker v. College Toyota, Inc.*, 519 F.2d 447 (4th Cir. 1975). Plaintiffs do not claim they suffered any actual damages, and hence they seek the statutory penalty of 15 U.S.C. § 1640(a)(2)(A)(i). Determination of the recovery under this subsection begins with the finance charge, and in the instant cases the improperly disclosed license and title fees would need to be added to the finance charges listed on the disclosure statements. As indicated at page 794 *supra*, since such fees were not disclosed they were to be included in the finance charge. For purposes of calculating statutory damages a court uses the amount which should have been included in the finance charge. *Young v. Ouachita National Bank in Monroe*, 428 F.Supp. 1323, 1327 (W.D.La.1977); *Doggett v. Ritter Finance Co. of Louisa*, 384 F.Supp. 150, 158 (W.D.Va.1974), *rev'd on other grounds*, 528 F.2d 860 (4th Cir. 1975); *Starks v. Orleans Motors, Inc.*, 372 F.Supp. 928, 932 (E.D.La.), *aff'd* 500 F.2d 1182 (5th Cir. 1974) (Table). In the *Dalton* case, the penalty would be: ($284.92 + $4.00) × 2 = $577.84. In the *Lowery* case, the finance charges exceeded $500, and hence the penalty would be the maximum $1,000 for each transaction.

 As indicated above, award of these penalties for a minor technical violation is highly inequitable, and the Court has no desire to allow the plaintiffs to recover such penalties. If there were discretion in the matter, no liability would be imposed on the defendant. Some courts have held or intimated that a court does have some discretion as to imposition of damages or that

equity can play a part in applying the Act. *See Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230, 237–38 (10th Cir. 1975);[16] *Palmer v. Wilson*, 502 F.2d 860, 862 (9th Cir. 1974); *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 652 (9th Cir. 1974); *Mitchell v. Security Investment Corp.*, 464 F.Supp. 650, 653 (S.D.Fla.1979); *French v. Wilson*, 446 F.Supp. 216, 221 (D.R.I.1978); *Jumbo v. Nester Motors, Inc.*, 428 F.Supp. 1085, 1087 (D.Ariz.1977) (no civil liability imposed where only technical violation occurred).

On the other hand, it has been held that "once the court finds a violation, *no matter how technical*, it has *no discretion* with respect to the imposition of [the civil] liability." *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir. 1976) (emphasis added), *rev'g Gordon v. Backus Cadillac-Pontiac, Inc.*, CCH Consumer Credit Guide ¶ 98,689 (S.D.Ga.1974) (failure to itemize $1.00 fee). *Accord, Charles v. Krauss Co., Ltd.*, 572 F.2d 544, 546 (5th Cir. 1978); *McGowan v. King, Inc.*, 569 F.2d 845, 849 (5th Cir. 1978); *Desselles v. Mossy Motors, Inc.*, 442 F.Supp. 897, 901 (E.D.La.1978) ("To impose liability . . . for . . . minor violation involving a $1.00 charge offends principles of fairness and equity . . . [but the court is] bound to do so . . . ."). *See also Thomas v. Myers-Dickson Furniture Co.*, 479 F.2d 740, 746 (5th Cir. 1973); *Franklin v. First Money, Inc.*, 427 F.Supp. 66, 71 (E.D.La.1976). It has also been held that no actual injury need be shown or that plaintiffs be deceived, *Dzadovsky v. Lyons Ford Sales, Inc.*, 593 F.2d 538, 539 (3d Cir. 1979), *rev'g* 452 F.Supp. 606 (W.D.Pa.1978); and that Congress did not intend creditors to escape liability where only technical violations were involved. *Pennino v. Morris Kirschman & Co., Inc.*, 526 F.2d 367, 370 (5th Cir. 1976); *Chapman v. Rhode Island Hospital Trust National Bank*, 444 F.Supp. 439, 444 (D.R.I.1978); *Ivey v. United States Department of Housing & Urban Development*, 428 F.Supp. 1337, 1342 (N.D.Ga.1977);

---

16. *But see Redhouse v. Quality Ford Sales, Inc.*, 523 F.2d 1 (10th Cir. 1975) (en banc) (rehearing).

*Houston v. Atlanta Federal Savings & Loan Association,* 414 F.Supp. 851, 855 (N.D.Ga. 1976); *Powers v. Sims and Levin Realtors,* 396 F.Supp. 12, 20 (E.D.Va.1975), *aff'd in part & rev'd in part,* 542 F.2d 1216 (4th Cir. 1976).

This Court indicated by dictum in *Jennings v. Edwards,* 454 F.Supp. 770, 778 n.13 (M.D.N.C.1978), that it would not impose liability on a creditor where a violation is *de minimus.* *Cf. George v. General Finance Corp.,* 414 F.Supp. 33, 35–36 (E.D.La.1976). On appeal, the Fourth Circuit, in an unpublished opinion, "affirm[ed] for the reasons stated by the district court." *Jennings v. Edwards,* 598 F.2d 614 (4th Cir. 1979). It could be argued that by this succinct pronouncement, the appellate court was intimating that it might allow a *de minimus* rule in Truth-in-Lending cases.

However, in the published case of *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), the court indicated that, once a violation of the Act or Regulation has been found, a court has no discretion as to the award of statutory damages. In *Barber,* the defendant had committed, *inter alia,* a technical violation,[17] and the court stated that such "technical violation of the Act [was] sufficient to subject . . . [the ·defendant] to civil liability under § 1640." 577 F.2d at 220. In discussing an amendment to the Act regarding statutory damages in class actions, the court noted that the amendment "made the *award of statutory damages* in the class context discretionary rather than a *matter of right* as

it had been before the amendment and as it continued to be *with regard to individual actions.*" 577 F.2d at 223 (emphasis added).[18]

Whatever the possible significance of the affirmance of *Jennings v. Edwards,* this Court must at this time follow *Barber v. Kimbrell's, Inc.,* as to the awarding of statutory damages. *Barber* is entitled to greater precedential value than the unpublished *Jennings* appellate opinion. *United States v. White,* 572 F.2d 1007, 1008 n.1 (4th Cir. 1978). Therefore, Dalton will be awarded $577.84 in statutory damages, and the Lowerys will receive $2,000. Although equity cries out against such award, this Court has no discretion in the matter.[19]

The court in *Gennuso v. Commercial Bank & Trust Co.,* 566 F.2d 437, 443 (3d Cir. 1977), remarked that "[a]ny misgivings about the technical nature of the requirements under the Act or Regulation should be addressed to Congress and the Federal Reserve Board, not to this Court." Fortunately, Congress has heeded the criticism and currently has before it a bill to amend the Truth-in-Lending Act. The Senate bill, S.108, is entitled the "Truth in Lending Simplification and Reform Act."

Excerpts of the report of the Senate Committee on Banking, Housing and Urban Affairs concerning the bill are below:

The committee's efforts have focused on four general areas: providing the consumer with simpler, more understandable information; making compliance easier for creditors; *limiting creditor civil liabil-*

---

**17.** Defendant used the term "Total Time Balance" instead of "Total of Payments" as required by Regulation Z, § 226.8(b)(3).

**18.** The court had earlier explained in *White v. Arlen Realty & Development Corp.,* 540 F.2d 645, 649 (4th Cir. 1975), that "Congress gave the debtor a right to specific information [in the Truth-in-Lending Act] and therefore defined 'injury in fact' as the failure to disclose such information."

**19.** One Fourth Circuit Judge has commented that "the Act is the bible that we must follow.

. . . I think it . . . significant that in establishing a statutory remedy Congress did not *authorize* the invocation of equitable doctrines. In short, where the statute is clear and unambiguous, it should be applied as written and not subverted by judicial notions of propriety." *Powers v. Sims and Levin,* 542 F.2d 1216, 1223 n.2 (4th Cir. 1976) (Winter, J., dissenting). *But see Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 227–28 (4th Cir. 1978) (Bryan, J., dissenting).

*ity for statutory penalties to only significant violations;* and strengthening administrative restitution enforcement of the act.

. . . . .

The committee has adopted, with minor modifications, the Federal Reserve Board's suggestions to simplify the typical truth in lending disclosure statement. The number of disclosures given the consumer would be reduced by eliminating the itemization of certain figures in favor of providing only the totals. Thus, for credit sales, like the purchase of an auto, the bill would eliminate disclosure of the "cash price," "down payment," and "unpaid balance of the cash price," in favor of disclosure of only the "amount financed."

. . . . .

Several provisions in this bill will make compliance with the act substantially easier for creditors. Perhaps the most important provision requires the Federal Reserve Board to promulgate model forms and clauses for common transactions. The use of these forms and clauses would be optional, but such use would guarantee compliance with the act.

. . . . .

[Section 6 of the bill] is designed to simplify the definition of finance charge. The bill will eliminate some current confusion by making clear that *charges which would also be incurred in a similar transaction for cash, such as* sales taxes, *license and registration fees, are not to be included in the finance charge.*

. . . . .

The bill would reduce the number of disclosures by *eliminating itemization of the amount financed* (the amount borrowed) *and the finance charge.*

. . . . .

Eliminating itemization of the amount financed and finance charge, will result in less information communicated to the consumer. On the other hand, the disclosure statement will be less crowded and more likely to draw the consumer's attention. The committee agrees with the Federal Reserve Board that this tradeoff is beneficial in that "informational overload" is a problem with the number of disclosures presently required. It is also the committee's belief that the reduced number of disclosures will not diminish the act's usefulness as a shopping tool.

. . . . .

[Section 15 of the bill] is intended to *restrict* the scope of creditor *civil liability for statutory penalties to only those disclosures which are of material importance in credit shopping.* The committee believes this will *eliminate litigation based on purely technical violations of the act.* Civil liability for actual damages and administrative liability would continue to attach to all the act's requirements.

In closed-end credit, a statutory penalty of $100 to $1,000 would attach only to rescission requirements and disclosure of the amount financed, finance charge, annual percentage rate, total of payments, number, amount, and due dates of payments, and the security interest statement. Thus, the *creditor will not be subject to a statutory penalty for more technical requirements.*

Senate Report No. 73, 96th Cong., 1st Sess. (1979), *reprinted in* CCH Consumer Credit Guide, pamphlet, issue no. 553, part II, at 3, 6, 12, 16, & 17 (May 3, 1979) (emphasis added).

With regard to the present cases, the proposed amendments to the Truth-in-Lending Act are of no comfort to defendant. Legally, the result here is correct; equitably, it is not. Such Robin Hood justice is repulsive to the Court. Nevertheless, the Court must find for the plaintiffs. A judgment will be entered accordingly.

IT IS ORDERED that, within ten (10) days from the date this Memorandum Opinion is filed, the parties' attorneys will confer and make a good faith effort to agree on the costs and attorney's fees due the

plaintiffs. *See* 15 U.S.C. § 1640(a)(3). If the attorneys cannot agree, they will notify this Court of their disagreement within the ten (10) day period; thereafter, and within thirty (30) days from the filing date of this Memorandum Opinion, plaintiffs' attorney will submit a petition for costs and attorney's fees in accord with the criteria set out in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir. 1978), and *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). Within twenty (20) days of the filing of the plaintiffs' attorney's petition, the defendant may make such reply as it deems appropriate.