Nick LJEPAVA and Chris Ljepava, Jr., Plaintiffs and Appellants,

v.

M. L. S. C. PROPERTIES, INC., et al., Defendants and Appellees.

Nos. 73–1707, 73–1756.

United States Court of Appeals, Ninth Circuit.

Feb. 12, 1975.

James W. Funsten (argued), San Francisco, Cal., for plaintiffs and appellants.

Sanford N. Diller (argued), Cupertino, Cal., for defendants and appellees.

## OPINION

Before LUMBARD,* KOELSCH and DUNIWAY, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiffs appeal from an order of the Northern District of California, entered by Judge Charles E. Wyzanski, Jr., sitting by designation, which denied them most of the relief that they had sought under the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and Regulation Z issued thereunder. 12 C.F.R. part 226 (1974). We reverse and remand.

The plaintiffs are two brothers, Nick and Chris Ljepava, who lived in Saratoga, California, in a five-room house on a fifteen-acre prune farm which they had inherited from their parents. The Ljepavas had lived on the land since 1923.

* United States Court of Appeals for the Second Circuit, sitting by designation.

In addition to raising prunes on their own property, the brothers, who had only eighth-grade educations, did piece work of an agricultural nature for surrounding farmers. The Ljepava farm was located in an area of new residential development, and there were potentially fourteen building lots on the tract. The trial judge found that since 1970 the property had had a market value of $225,000. Immediately prior to the arrangement of the mortgage loan which is the subject of this suit, there were two encumbrances on the land: a first deed of trust in favor of Ira and Antonie Brotzman in the amount of $92,771.29 and a second deed of trust in favor of Henry L. and Nadine B. Ethier in an original amount of $18,000. On April 18, 1972, a notice of default was recorded by Mrs. Ruth C. Armes, the assignee of the Ethier deed of trust.

Since their equity in the land of some $100,000 was jeopardized by the possibility of a foreclosure sale pursuant to the notice of default, the Ljepavas sought to refinance the second deed of trust. It appears from the evidence and the trial judge's findings that the Ljepavas were afraid that Mrs. Armes was out to take their land from them in some nefarious way.[1]

Prior to the filing of the notice of default, the Ljepavas had been contacted by Norman S. Lopes, an agent of Paul O. Paulson, a mortgage loan broker doing business as the Paulson Mortgage Company.[2] Paulson tentatively arranged a $30,000 loan for the Ljepavas in early April 1972, but at the last minute the Ljepavas decided not to go through with the deal. In early May the Paulson organization began arranging a new loan to pay off the second deed of trust. On May 9, Lopes told the Ljepavas that he was having serious difficulties and that it would be necessary for another mortgage loan broker, HLC Financial, a subsidiary of M.L.S.C. Properties, Inc., to be brought into the transaction. The trial judge found, and we agree, that while Lopes told the Ljepavas that an increased commission would be required, he did not indicate the amount of that commission.

On May 11, the deal was closed. The disclosure statement required by the Truth in Lending Act and the Federal Reserve Board's Regulation Z that was presented to the Ljepavas indicated that the face amount of the promissory note was $36,000.[3] Of that amount $24,480 was paid to Mrs. Armes or to or on behalf of the Ljepavas.[4] The statement indicated that a commission of $5,400 was to be paid to Paulson Mortgage Company and a commission of $6,120 was to be paid to HLC Financial. The loan was for one year at 10% interest, which amounted to $3,600. A sum of $200 was payable in addition to the interest which the statement included in the total interest charge. Thus the total finance charge was $15,320—the sum of the commissions, the 10% interest, and the extra payment of $200. The disclosure statement showed that the annual percentage rate charged for the loan was 43%. That number was obtained by comparing the finance charge for the one-year loan—$15,320—to the face amount of the note—$36,000. In addition, the statement indicated that if the loan was paid off before maturity, all unaccrued interest would be cancelled, but that there would be a "pre-payment charge" of twelve months' unearned interest.

---

1. This fear was somewhat irrational since Mrs. Armes's husband was the mortgage loan broker who had originally arranged the Ljepavas-Ethiers mortgage and had only agreed to take the mortgage off the Ethiers' hands when the Ljepavas became delinquent.

2. A mortgage loan broker brings together landowners in need of money and individual investors who are interested in making mortgage loans. The broker arranges a deal between the landowner and any number of lenders. Expert testimony at trial indicated that for his work a broker normally receives a commission. The commission on the Ethier mortgage was ten per cent.

3. The disclosure statement is reproduced as an appendix to the opinion.

4. The Ljepavas received $1,092.31 in cash.

The disclosure statement did not indicate that there were actually ten promissory notes involved—not one. The obligees of the notes and their respective amounts were as follows: Donald E. and Louise Slusher, $3,500; Robert A. Lewis, $4,000; Collier N. and Theresa V. Gallucci, $2,500; John P. and Roberta E. Briano, $1,500; Mrs. Roy M. Austin, $10,000; George M. Boyd, $1,000; Murray M. and Anne D. Montgomery, $2,000; Charles P. R. and Lois C. Short, $5,000; Irma Smith Van Riesen, $5,000; Vera T. Lynly, $1,500. There was only one deed of trust in which M.L.S.C. Properties, Inc., was named the trustee for the benefit of the promisees.

In addition to signing the ten notes, the deed of trust, and the disclosure statement, both brothers signed a statement waiving their right to rescind the transaction. The statement was written by Chris Ljepava as dictated to him by Lopes. The statement said: "5/11/72 In order to expedite this loan we wish to waive our three day right of rescission as our property is in default and we are close to foreclosure."

At trial Nick Ljepava indicated that he did not understand all of the loan's terms and that the brothers expected to get about $5,000 in cash instead of the $1,000 they actually received.

After the Ljepavas failed to make the payments required by the notes, M.L.S.C. Properties, Inc., recorded a notice of default and proposed to sell the property at a foreclosure sale on November 15, 1972. In order to prevent this sale, the Ljepavas filed this suit in the district court on November 2, 1972. Their complaint asked for an injunction restraining M.L.S.C. Properties, Inc., from selling the land at a foreclosure sale, for rescission of the transaction, and for the civil

penalties and attorneys' fees provided by the Truth in Lending Act. The district court issued a preliminary injunction, and a trial was held on January 15 and 16, 1973.

On the basis of the facts outlined above, the trial judge found that the Truth in Lending Act had been violated in that the disclosure statement failed to comply with section 129(a)(2) of the Act, 15 U.S.C. § 1639(a)(2), because HLC Financial's role in the transaction was not explained. The trial court granted judgments of $1,000 in favor of the Ljepavas against each of defendants Lopes and Paulson, and jointly against HLC Financial, M.L.S.C. Properties, Inc., and Mortgage Loan Servicing Corporation, and awarded the Ljepavas attorneys' fees of $3,000 against the same defendants, Ljepya [sic] v. M.L.S.C. Properties, 353 F.Supp. 866 (N.D.Calif.1973). In addition, the district judge held that plaintiffs could rescind the loan contract if plaintiffs tendered to defendants, within ten days, an amount equal to the proceeds of the loan disbursed to them or for their account ($24,480) plus the amounts subsequently advanced by defendants to the holders of the first deed of trust ($8,681.49). *Id.*

At the expiration of the ten-day period provided in the court's order, the defendants moved to dissolve the preliminary injunction against holding a foreclosure sale on the ground that the plaintiffs had failed to avail themselves of the court's rescission order. At a hearing on the motion, the judge insisted on a yes or no answer to the question of whether a tender had been made—a question plaintiff's counsel found difficult to answer. Although the trial judge scarcely allowed the Ljepavas' counsel to get a word in edgewise,[5] it appears that

---

5. "The Court: Now I am only going to put one question which I want answered briefly. I am asking counsel for the plaintiff whether or not the plaintiff, within the ten days after January 15, 1973, did make tender, or whether they did not. Did they make tender, yes or no?

"Mr. Funsten: "I can't answer yes or no.

"The Court: Then you will be held to have said no. Sit down, and you will be held in contempt if you again evade the question of The Court. Did they make tender, yes or no?

"Mr. Funsten: Well, I will explain what I mean by my answer, Judge—

"The Court: Yes or no?

"Mr. Funsten: I would say—

counsel was attempting to argue that defendants' failure to cooperate had frustrated plaintiffs' attempts to arrange a tender.

While there is no evidence in the record concerning events subsequent to the trial,[6] it appears that within the ten-day period in question the Ljepavas had finalized arrangements to sell their property to Anthony Cansano for $180,000 and that an escrow account had been set up to facilitate the sale. It appears that defendants refused to agree to release their mortgage subject to the subsequent payment to them of $33,161.49 from the escrow account. Instead they apparently maintained that the rescission order permitted them to insist upon payment prior to their release of the mortgage. The trial judge, concluding that plaintiffs had failed to tender in accordance with his rescission order, dissolved the injunction and cancelled the award of attorneys' fees. It is from this action that plaintiffs appeal.

Within three weeks after the post-trial hearing, it appears that the Ljepavas successfully completed the sale of their property for $180,000, and paid the defendants $67,356.62 so that they would release their deed of trust. Of the amount paid defendants, $33,161.49 represented the amount which would have been payable under the court's order; the remainder covered, *inter alia,* the commissions to HLC Financial and Paulson Mortgage of $11,520.00, a prepayment penalty of one year's interest ($3,600.00), and attorneys' fees of $10,000.

The Ljepavas contend that the trial judge's view of the rescission remedy provided by the Truth in Lending Act was too restrictive in that they should not have been required to tender $33,161.49 before defendants were under an obligation to release their mortgage. In light of events since trial, the Ljepavas maintain that they should be allowed to recover all of the monies they paid to defendants in excess of $33,161.49. In addition, they claim that the trial judge did not have the power to and should not have revoked his initial award of attorneys' fees and that the trial court should have awarded them damages under the civil penalties provision of the Act against the individual promissees of the ten notes.

### Adequacy of the Disclosure Statement

The Truth in Lending Act provides a damage remedy and a right to rescind a loan agreement to the borrower when the lender's disclosure statement is stat-

"The Court: Yes or no? Don't trifle with This Court.

"Mr. Funsten: I don't mean to trifle with The Court, Your Honor—

"The Court: You are being held, and I intend to hold you personally. Yes or no? Mr. Funsten: I would say it's then frustrated—

"The Court: Yes or no? Do you want to go to jail?
"Mr. Funsten: I would say tender—

"The Court: Yes or no?
Mr. Funsten: I would say—

"The Court: Yes or no? Now I will put it once more—

"Mr. Funsten: No, because of the impossibility. That's the only way to answer it, Your Honor, most respectfully, because they made, they asked for a demand and no demand was given to them, and there is $180,000.00 in escrow, as I understand it, from the title officer and I have a letter.

"The Court: I am going to rescind that part of my order which has to do with allowance of counsel fees.

"Mr. Diller: Your Honor, I have evidence to produce under oath that there is absolutely no tender made as intended by The Court, and I would like to call Mr.—

"The Court: Quite unnecessary to do it. You may make application for rescission of that part of the judgment which had to do with the allowance of counsel fees on the grounds that counsel, by conduct, consequently showed that he was not entitled to pay for his services, he being in obvious contempt of The Court and obviously evasive."

6. When the motion hearing commenced, there were no written papers filed with the court concerning the events since trial. Defendants later filed typed motion papers which asserted that no tender had been made. Counsel for the Ljepavas submitted a five-page handwritten statement which is not now in the record. No testimony was taken.

utorily inadequate. Truth in Lending Act §§ 125(a), 130; 15 U.S.C. §§ 1635(a), 1640(a). The disclosure statement that was presented to the Ljepavas is set forth in the Appendix.

The district court found that disclosure statement inadequate because it did not explain how HLC Financial was involved in the transaction. Specifically, the court felt that the statement failed to comply with section 129(a)(2) of the Act, 15 U.S.C. § 1639(a)(2), which requires that charges "which are included in the amount of credit extended but which are *not* part of the finance charge" must be "individually itemized." The trial judge obviously erred in this conclusion since the payment to HLC Financial was part of the finance charge. Hence, section 129(a)(2) does not apply here. However, our examination of the disclosure statement convinces us that the statement is inadequate for several other reasons.

■ First, the disclosure statement understates the annual percentage rate of the finance charge by almost one half. The disclosed rate was apparently calculated by dividing the face value of the note (which included most of the finance charge) into the finance charge. Proper calculation requires that the amount financed (which does not include any part of the finance charge) be divided into the finance charge. This computation yields an annual percentage rate of 62.5%.

The defendants do not attempt to justify their method of calculation in their brief except to assert that such interest rate calculations are very complex. We do not agree. Since this is a one-year note with no principal payments due until the entire note is payable, the annual interest rate is easily calculable. It is necessary only to divide the amount financed into the finance charge.

■ The method of calculation that we adopt here is supported by the Federal Reserve Board which is the agency charged with administering the Act. In a somewhat analogous situation, it wrote:

Section 129(a)(1) of the Act makes it clear that the amount financed is intended to be the net amount of credit which the customer will have the actual use of. In the case in which he receives $1,000 but pays back $100 in prepaid finance charges, he has actual use of $900 and this would be the amount financed. Consequently, in those cases in which prepaid finance charges are paid in cash they should be deducted from the amount of the loan in order to determine the amount financed for purposes of disclosure and computing the annual percentage rate.

Federal Reserve Board Public Position Letter No. 61, August 8, 1969, in 2 R. Clontz, Jr., Truth-in-Lending Manual E–127 (3rd ed. 1973). See also Federal Reserve Board Public Position Letter No. 108, September 9, 1969, in *id.* at E–142; Federal Reserve Board Public Position Letter No. 363, June 17, 1970, in *id.* at E–240. See generally A. Arnold, Truth-in-Lending and Fair Credit Reporting Forms Guide 226–30, 400 (1972); 1 R. Clontz, Jr., Truth-in-Lending Manual chap. 5 (3rd ed. 1973). While expressions of the Federal Reserve Board are not binding upon us, they should be treated as persuasive authority. Eby v. Reb Realty, Inc., 495 F.2d 646, 649–50 (9th Cir. 1974); Bissette v. Colonial Mortgage Co. of D. C., 155 U.S.App.D.C. 360, 477 F.2d 1245, 1246 (1973). In this instance the Board's position seems clearly correct. The statute provides that the annual percentage rate is "that nominal annual percentage rate which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed." Truth in Lending Act § 107(a)(1)(A), 15 U.S.C. § 1606(a)(1)(A). In this case the amount financed was $24,480 and no part of it was to be paid until the end of the year. Sixty-two and one-half per cent of that amount is approximately $15,320, which was the amount of the finance charge. The disclosure statement given to the Ljepavas was inadequate because it grossly understated the annual percentage rate of the finance charge.

■ Second, the disclosure statement did not explain how charges for late payments were to be calculated as is required by section 129(a)(7) of the Act, 15 U.S.C. § 1639(a)(7), and Regulation Z, 12 C.F.R. § 226.8(b)(4) (1974). The statement simply says "Refer to note." This is inadequate.

■ Defendants claim that such a reference to a second document is permitted by section 129(b) of the Act which provides that "the disclosures required by subsection (a) of this section . . . may be made by disclosing the information in the note or other evidence of indebtedness to be signed by the obligor." 15 U.S.C. § 1639(b). We think that this provision means that the required disclosures can be made by including all required information in the instrument of indebtedness, not that some of the information can be disclosed in the disclosure statement while other information is disclosed in another document. The whole purpose of the Truth in Lending Act is to provide meaningful disclosure to a borrower. Such a goal is not met if the borrower must examine several documents to learn the terms of the loan agreement.

This conclusion is supported by the regulations issued by the Federal Reserve Board which state:

> At the time disclosures are made, the creditor shall furnish the customer with a duplicate of the instrument or a statement by which the required disclosures are made and on which the creditor is identified. All of the disclosures shall be made together on either (1) The note or other instrument evidencing the obligation on the same side of the page and above or adjacent to the place for the customer's signature; or (2) One side of a separate statement which identifies the transaction.

12 C.F.R. § 226.8(a) (1974). See also 12 C.F.R. § 226.801 (1974).

■ Even if disclosure in separate documents was permissible, we would still find this disclosure inadequate. First, it fails to specify where the relevant information can be found in the promissory note. Second, in the phrase "Refer to note," the meaning of the word "note" is ambiguous—it could refer to a footnote or a promissory note. When the latter is referred to elsewhere in the disclosure statement, the word "Note" is used. Moreover, as previously indicated, and as we shall discuss further below, there were ten promissory notes involved here, and the meaning of a reference to a singular "note" is far from clear. In light of all these considerations we find that the disclosure statement failed adequately to explain the method of calculating late charges.

■ Third, the disclosure statement fails adequately to explain each element of the finance charge as is required by Regulation Z. 12 C.F.R. §§ 226.6(d), 226.8(d)(3) (1974).[7] This failure was noted by the trial judge, although as we indicated above, he applied the wrong statutory provision. HLC Financial is not identified in any way in the disclosure statement, nor is it mentioned in the deed of trust or the notes that the Ljepavas signed. Moreover, the Ljepavas apparently had no direct dealings with HLC Financial so that disclosure was particularly necessary. The bare reference to HLC Financial fails adequately to explain what role it played in the transaction. The omission to give such an explanation is especially significant here since HLC Financial represented only the lenders who had interests adverse to those of the Ljepavas.

■ Finally, the Ljepavas argue that the disclosure statement was inadequate because it was given to them at the same time that the transaction was completed. They note that the purpose of the Truth in Lending Act was "to assure a meaningful disclo-

7. 12 C.F.R. § 226.6(d) (1974) requires that "[i]f there is more than one creditor in a transaction, each creditor shall be clearly identified . . . .." 12 C.F.R. § 226.8(d)(3) (1974) states: " [T]he following items . . . shall be disclosed: . . . (3) . . . . the total amount of the finance charge, with a description of each amount included . . .."

sure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him . . . ." Truth in Lending Act § 102, 15 U.S.C. § 1601. They argue that shopping for credit requires that the disclosure statement be provided sufficiently in advance so that a borrower would have the opportunity to go to another lender to see if he could obtain better terms. While we find that this argument is logically persuasive, it has been rejected by virtually every court that has considered it. Bissette v. Colonial Mortgage Co. of D. C., *supra*, revg. 340 F.Supp. 1191 (D.D.C.1972); Foster v. Maryland State Savings and Loan Ass'n, 369 F.Supp. 843 (D.D.C. 1974); Stavrides v. Mellon Natl. Bank & Trust Co., 353 F.Supp. 1072, 1078–79 (W.D.Pa.), aff'd on other grounds, 487 F.2d 953 (3d Cir. 1973); *cf.* Stevens v. Rock Springs Natl. Bank, 497 F.2d 307, 310 (10th Cir. 1974). We need not decide this question, however, because the disclosure statement in this case is clearly inadequate for the other reasons discussed above.[8]

### Waiver of Rescission

■ Defendants argue that even if the disclosure statement was inadequate, the Ljepavas waived their right to rescind. The Truth in Lending Act authorizes the Federal Reserve Board to "prescribe regulations authorizing the modification or waiver of [the right of rescission]" "to permit homeowners to meet bona fide personal financial emergencies." Truth in Lending Act § 125(d), 15 U.S.C. § 1635(d). The Board has issued such regulations:

A customer may modify or waive his right to rescind a transaction subject to the provisions of this section provided:

(1) The extension of credit is needed in order to meet a bona fide immediate personal financial emergency of the customer;

(2) The customer has determined that a delay of 3 business days in performance of the creditor's obligation under the transaction will jeopardize the welfare, health, or safety of natural persons or endanger property which the customer owns or for which he is responsible; and

(3) The customer furnishes the creditor with a separate dated and signed personal statement describing the situation requiring immediate remedy and modifying or waiving his right of rescission. The use of printed forms for this purpose is prohibited.

12 C.F.R. § 226.9(e) (1974).

Both the statute and the regulation require the existence of a "bona fide" emergency. The reason given in the Ljepavas' waiver statement was that they needed the money because they were "close to foreclosure." Since foreclosure under the Armes mortgage, which was the one in default, was not possible for more than two months, it is clear that in reality the Ljepavas faced no "bona fide immediate personal financial emergency" as would be required by the regulation.

The regulations clearly require that a real financial emergency exists. Hence, to be safe a lender should inquire into any claimed emergency before he accepts a waiver. While there may be cases where it may be unfair to hold a lender to knowledge of the borrower's financial condition, we have no hesitation in hold-

---

**8.** There are also other ways in which the disclosure statement was inadequate. For example, the disclosure statement failed to indicate that interest began to accrue on May 10, 1972, which was one day before the transaction was consummated. Such a disclosure is required by 12 C.F.R. § 226.8(b)(1) (1974). In addition, Regulation Z requires that the "prepaid finance charge" be shown in the disclosure statement. 12 C.F.R. § 226.8(d)(2) (1974). In this case, the disclosure statement has a blank for what it indicates is the "total" of the brokerage fees for negotiating the placement of the mortgage, but the blank has one entry in it—"Paulson Mtg. $5,400.00" and one entry above it—"HLC Financial $6,200.00." Thus the statement fails to give the information that is required by the regulation and that it purports to give since no *total* of the prepaid finance charges is shown.

ing that here the waiver was ineffective because the lenders knew from a title check that they had ordered on the property that no foreclosure was imminent. The purported waiver of their right of rescission by the Ljepavas was ineffective since they faced no bona fide personal financial emergency.[9]

### Was Rescission Timely?

█ The statute provides that a borrower can rescind a transaction "until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required . . . whichever is later, by notifying the creditor." Truth in Lending Act § 125(a), 15 U.S.C. § 1635(a). The inadequacies in the disclosure statement discussed above were never corrected. Thus, the Ljepavas have always had a right to rescind the transaction and they notified the creditors of their intent to do so prior to trial. See Sosa v. Fite, 498 F.2d 114, 117–18 (5th Cir. 1974).

### Mechanics of Rescission

Since we have concluded that the Ljepavas had a right to rescind the transaction, it is necessary to determine whether the trial court was unduly restrictive in its rescission order and thus frustrated the purposes of the Act. The procedure to be followed in rescission cases is outlined in the statute and has been interpreted recently by this court. The statute provides:

> When a [borrower] exercises his right to rescind, . . . he is not liable for any finance or other charge, and any security interest given by the [borrower] becomes void upon such a rescission. Within ten days after receipt of a notice of rescission, the creditor shall return to the [borrower] any money or property . . . and shall take any action necessary or appropriate to reflect the termination of

any security interest created under the transaction. If the creditor has delivered any property to the [borrower], the [borrower] may retain possession of it. Upon performance of the creditor's obligations under this section, the [borrower] shall tender the property to the creditor . . .

Truth in Lending Act § 125(b), 15 U.S.C. § 1635(b). The plain language of the statute seems to suggest that the defendants should have been required to remove their lien prior to tender by the Ljepavas. See Palmer v. Wilson, 502 F.2d 860, 863–64 (9th Cir. 1974) (Wright, J., dissenting); Sosa v. Fite, supra, 498 F.2d at 118–19.

However, we have recently indicated that the statute should not be read as requiring the lender to perform first. In Palmer v. Wilson, supra, the majority held that a trial judge had the discretion to condition rescission on tender by the borrower of the property he had received from the lender.

█ In this case we think that reversal is appropriate. Here the district court apparently felt that it had no discretion and that tender was a mandatory requirement for rescission. This view is inconsistent with the statute and our decision. There were such egregious violations of the Truth in Lending Act here that the district court should have provided a more liberal remedy for the Ljepavas. Under the Act a court should be concerned that defendants ultimately receive the money they advance under a loan agreement, but it must be careful that such concern does not provide lenders with a method of frustrating the main purpose of the Act, which is to allow rescission. The least the court should have done when it appeared that there was a factual dispute over whether tender had been made within the ten-day limit it had imposed was to hold a hearing to determine what actually had happened.

---

**9.** Although the trial judge did not discuss the waiver issue in his written opinion, the argument was raised below, so it seems clear that the trial court did not believe that the waiver was effective either.

It appears that the Ljepavas did sell their land within three weeks after the hearing on January 30, 1974, and that they paid defendants not only the amounts originally financed and the amounts subsequently advanced by defendants to the holders of the first deed of trust, but an additional $34,195.13. If it is determined on remand that the defendants did receive those amounts, the Ljepavas are entitled to rescission under the Truth in Lending Act. They should be awarded any amounts that they paid to defendants in excess of $33,161.49 (the amount of the advances and the original loan).

### Civil Penalties

■ In addition to providing terms for rescission, the trial court awarded the Ljepavas $3,000 under section 130(a) of the Truth in Lending Act. 15 U.S.C. § 1640(a).[10] That part of the judgment still stands and neither party objects to it. We have previously held that the Act clearly authorizes both rescission and award of civil penalties in the same case. Eby v. Reb Realty, Inc., 495 F.2d 646 (9th Cir. 1974).

■ However, the trial court assessed civil penalties only against the three mortgage brokers—Lopes, Paulson, and HLC Financial. The Ljepavas claim that penalties should have been assessed against the promisees of the ten notes. Their contention is correct if the promisees were "creditors" under the Act. The statute limits the term creditor to include only "creditors who regularly ex-

tend, or arrange for the extension of, credit for which the payment of a finance charge is required." Truth in Lending Act § 103(f), 15 U.S.C. § 1602(f).

Whether the promisees in this case are creditors is a factual question as to which this record contains no evidence, Sarter v. Mays, 491 F.2d 675, 676 (5th Cir. 1974), which should be determined by the district court on remand. It is possible that some or all of the promisees lent money on a regular basis. See generally Eby v. Reb Realty, Inc., supra, 495 F.2d at 648–50.

### Attorney's Fees

■ Section 130(a) also provides for "a reasonable attorney's fees as determined by the court" in successful actions to enforce civil penalties. 15 U.S.C. § 1640(a)(2). The trial court originally awarded plaintiffs $3,000 in attorneys' fees. The trial court later cancelled this award, apparently as a result of a misunderstanding between himself and plaintiffs' counsel. See note 5, supra. We feel that this misunderstanding was unfortunate and was based in part on the trial court's misinterpretation of the statute. Since we feel that attorneys' fees are appropriate in this case, the trial court on remand should award an attorneys' fee based on counsel's work in the original proceeding, on appeal, and on remand.

Reversed and remanded for further proceedings consistent with this opinion.

See Appendix on next page.

---

**10.** Section 130(a) provides:

Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this part to be disclosed to that person is liable to that person in an amount equal to the sum of

(1) twice the amount of the finance charge in connection with the transaction,

except that the liability under this paragraph shall not be less than $100 nor greater than $1,000; and

(2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court. 15 U.S.C. § 1640(a).

APPENDIX

Paul O. Paulson—Mortgage Loan Broker
175155 E. Campbell Ave., P. O. Box 386
Campbell, Calif. 95008
378–2100

Loan No. A1828–B

Disclosure Statement of Loan
Made in Compliance with Federal Law
(which designates arranger as a creditor)

Loan secured by Deed of Trust on:
(street and address number and/or legal description of property)
  14133 Fruitvale Ave., Saratoga, Ca.

Loan arranged by Paul O. Paulson, Mortgage Loan Broker. Finance Charge accruing from date of deposit of loan funds in escrow.

A.  Credit extended but not part of Finance Charge:
  (1) Appraisal fees and processing
      to HLC Financial ................$    100.00
  (2) Escrow fees ....................$    57.25
  (3) Costs of investigating or guar-
      anteeing title ..................$    167.40
  (4) Notary fees .....................    None
  (5) Recording fees .................$    13.00
  (6) Credit investigation fees ........    None
  (7) Fire insurance premium .........    None
  (8) Due on prior liens, including
      reconveyance, etc., fees:  .........$22,314.38
  (9) Due other creditors,
      Collection Bureau ..............$    574.83
  (10) Assumption, transfer, forward-
      ing and beneficiary statement
      fees ...........................    None
  (11) Any premium for insurance,
      other than fire insurance (not
      required by creditor for approv-
      al of loan) ....................    None
  (12) Other payment on order of bor-
      rower: Brad Renn ..............$    147.50
      Human Resources          $    13.33
      ——————————— ...............    None
      ———————————— ...............
  (13) Estimated balance to be deliv-
      ered to borrower ...............$  1,092.31
  (14) Amount Financed (the sum of
      of items 1 through 13) ....................$24,480.00

B.  Credit extended as part of Finance Charge:
  (15) The total of the bonuses, bro-
      kerage, or commissions con-
      tracted for or to be received

B. Credit extended as part of Finance Charge:—Continued

        by any person for negotiating, procuring or arranging or making a loan. (Prepaid finance charge) Earned in full for services rendered     HLC Financial   $ 6,120.00

         Paulson Mtg.   $ 5,400.00

        Principal sum of Note (Item 14 + 15) ...........................$36,000.00

(16) Interest for period of loan ........$ 3,800.00 *

        On prepayment, unaccrued interest is cancelled except for prepayment charge of 12 months' unearned interest.

(17) Finance Charge (Items 15 + 16) ...............$15,320.00

C. Annual Percentage Rate: 43%.

D. Loan terms

    (1) Rate of interest: 10% per annum on unpaid principal balance with 12 installments of $300.00 each and a final balloon payment of $36,000.00.

    Total payments: $39,800.00. Payments due on the 1st day of each month.

    Late charges: $12.00 after 10th and $15.00 after 20th of same month. Refer to note.

    * includes approximate payment of $200.00 which will be billed after close of escrow.

Borrower understands that third persons such as but not limited to a title company may rely upon this representation and represents he has read all of the above; that the matters recited therein are true, that he received a copy thereof.

/s/ Nick Ljepava                /s/ Chris Ljepava, Jr.
    Borrower                        Borrower

Dated May 11, 1972