Jim **DIXEY**, Plaintiff,

v.

The **IDAHO FIRST NATIONAL BANK,**
**a national banking association,**
**Defendant.**

**Civ. No. 79–4085.**

United States District Court,
D. Idaho.

Jan. 9, 1981.

Idaho Legal Aid Services, Inc., Nancy Ferris, Pocatello, Idaho, for plaintiff.

David M. Edson, Boise, Idaho, for defendant.

## MEMORANDUM DECISION

CALLISTER, District Judge.

### I. INTRODUCTION

This action arises out of a consumer credit transaction. On October 17, 1978, the plaintiff, Jim Dixey, purchased from Ron Sayer, Inc., a 1974 Chevrolet pickup truck. The defendant, The Idaho First National Bank, loaned to plaintiff the principal sum of $2,391.02 to facilitate the acquisition of the vehicle. In turn, Ron Sayer, Inc., assigned to the defendant the Sale and Loan Agreement which evidenced the transaction.

The plaintiff subsequently filed suit alleging several violations of the Truth in Lending Act, 15 U.S.C. § 1601, et seq., and Federal Reserve Board Regulation Z, 12 C.F.R. § 226.1, et seq., which implements the Act. This Court's jurisdiction is in-

voked pursuant to 15 U.S.C. § 1640(e) and 28 U.S.C. § 1337.

The plaintiff has now moved for summary judgment and contends that the defendant has violated the Truth in Lending Act (hereinafter "TILA") as a matter of law in the following respects:

1. By failing to place all prepayment charges and delinquency charges together on the same side of the same page as other required disclosures in violation of Regulation Z, 12 C.F.R. § 226.8(a);

2. By failing to print the terms "finance charge" and "annual percentage rate" more conspicuously than other required disclosures in violation of Regulation Z, 12 C.F.R. § 226.6(a);

3. By failing to clearly identify the creditor in the transaction in violation of Regulation Z, 12 C.F.R. § 226.8(a);

4. By failing to clearly and meaningfully disclose the consequences which acceleration of the debt would have on the unearned finance charge in violation of Regulation Z, 12 C.F.R. § 226.8(b)(7);

5. By failing to disclose a security interest in the insurance proceeds in violation of 15 U.S.C. § 1639(a)(8) and Regulation Z, 12 C.F.R. § 226.8(b)(5);

6. By failing to disclose default charges in violation of 15 U.S.C. § 1639(a)(7) and Regulation Z, 12 C.F.R. § 226.8(b)(4);

7. By incorrectly placing signature lines in violation of Regulation Z, 12 C.F.R. § 226.8(a) and Regulation Z Interpretations § 226.801;

8. By failing to use the required terminology regarding the notice of information on the reverse side in violation of Regulation Z, 12 C.F.R. § 226.8(a) and Regulation Z Interpretations § 226.801; and

9. By using incorrect type size and by incorrectly placing the home solicitation notice in violation of Regulation Z, 12 C.F.R. § 226.6(c).

1. Defendant contends that § 226.6(d) controls since two creditors are involved. As a practical matter, the statutory requirements are identical. Section 226.6(d) requires that each credi-

## II. DISCUSSION

The Congressional objective in enacting TILA is disclosed in 15 U.S.C. § 1601(a).

(a) The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

Briefly stated, the goal which Congress sought to achieve was the informed use of consumer credit by requiring financial institutions to meaningfully disclose credit terms.

It appears, from a review of the defendant institution's Sale and Loan Agreement, that Idaho First National Bank has drafted a form which essentially satisfies the goal of meaningful disclosure of credit terms. However, the form suffers from several technical defects under TILA and Regulation Z. A brief discussion follows of each of the alleged violations.

A. *Failure to Clearly Identify the Creditor —12 C.F.R. § 226.8(a):*

 Regulation Z, 12 C.F.R. § 226.8(a), provides that the customer shall receive a copy of the disclosure statement at the time the disclosures are made "and on which the creditor is identified." No indication is given as to the extent to which the creditor must be identified other than the general requirement in 12 C.F.R. § 226.6 that all disclosures be made clearly and conspicuously.[1]

tor be clearly identified, while § 226.8(a), when read in conjunction with § 226.6(a), also requires a clear identification of the creditor.

The logo of the defendant bank, including the words "Idaho First—The Bank," appears at the top of its form. However, the plaintiff maintains that the address or branch must also be disclosed, and cites *In re Wilson*, 411 F.Supp. 751 (S.D.Ohio 1975) in support of his assertion. *Wilson*, however, is hardly dispositive of the issue in the instant case, since the bank in *Wilson* altogether omitted its name from the disclosure statement. Perhaps more analogous to the instant case is *Welmaker v. W. T. Grant Company*, 365 F.Supp. 531 (N.D.Ga.1972). In that case, the contract forms disclosed the seller as "W. T. Grant Company, 441 Broadway, New York, N.Y. 10018." Under the blank entitled "seller's place of business" was the designation " # 70," indicating store number 70. The court held that the identification was insufficient. It should be noted, however, that the court's conclusion was based on a finding that the insertion of " # 70" served to confuse the customer. Furthermore, in finding for the customer on that issue the court conceded that the violation was a "technical" one. In a later case in the same district, *Houston v. Atlanta Federal Savings and Loan Ass'n*, 414 F.Supp. 851 (N.D.Ga.1976), the Special Master concluded that *Welmaker* was not controlling. *Welmaker* was distinguished on the ground that the creditor in *Houston*, unlike the creditor in *Welmaker*, was not a national chain having offices and stores in many states. Instead, the Special Master found that the defendant conducted business under the name Federal Savings and Loan solely in the Atlanta metropolitan area, through some 21 offices, and that plaintiffs could make loan payments at any of these offices or by mail. The district court, in following the Special Master's recommendation, made the following comment:

> [U]nlike the circumstances in the *Welmaker* case, there is no possibility that plaintiffs herein could be confused or misled concerning the identity of their creditor. Although better practice requires disclosure of the creditor's full address, in

the circumstances presented, where the creditor is a mortgage lender located in one area of one state, full disclosure of the name of the creditor is all that is required. Plaintiffs' arguments to the contrary are without merit. 414 F.Supp. at 859.

The circumstances in the instant case are more akin to those in *Houston* than in *Welmaker*. The bank's operations are not nationwide, but statewide; the number of branches is relatively small, and the plaintiff, like the plaintiffs in *Houston*, could make payments by mail or at any of the defendant's branch offices. In addition, Ralph C. Clontz, Jr., author of *Truth-in-Lending Manual* (4th ed. 1976), and one of the leading authorities regarding Regulation Z offers this advice: "It is suggested that a court should not award civil damages for a failure to furnish an address, so long as the creditor is adequately identified." *Clontz, supra*, at ¶ 2.06[6] (Supp.1980). Consequently, this Court concludes that the plaintiff is not entitled to judgment as a matter of law regarding the adequacy of the identification of the creditor.

**B. Failure to Disclose the Consequences of Acceleration—§ 226.8(b)(7):**

█ The plaintiff alleges that the defendant has violated TILA by disclosing the right of acceleration but failing to mention the effect which acceleration has on the unearned finance charge. The precedential value of the case cited by plaintiff in support of this allegation, *St. Germin v. Bank of Hawaii*, 573 F.2d 572 (9th Cir. 1977), has been undermined by a recent Supreme Court decision, *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). In *Milhollin*, the Court of Appeals for the Ninth Circuit had held that TILA imposes a general acceleration clause disclosure requirement. Rather than holding that acceleration is a default charge, the Court of Appeals based its decision on the Regulation Z requirement that the creditor disclose: (1) whether a rebate of unearned interest will be made upon

acceleration, and (2) the method by which the amount of the rebate will be computed. The Supreme Court, deferring to Federal Reserve Board staff interpretations, reversed the ruling of the Court of Appeals and held that the right of acceleration need not be disclosed, and that the rebate practice under acceleration must be disclosed only if it differs from the creditor's rebate policy with respect to voluntary prepayment. In arriving at its conclusion, the court made this observation: "*Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure ... and the need to avoid ... [informational overload].'" 444 U.S. at 568, 100 S.Ct. at 798 (emphasis in original). The plaintiff has not established, nor has he even alleged, that the creditor's rebate policy upon acceleration of the debt is different from the policy upon voluntary prepayment of the debt. Plaintiff is therefore not entitled to summary judgment on this issue.

C. *Failure to Disclose a Security Interest —15 U.S.C. § 1639(a)(8) and 12 C.F.R. § 226.8(b)(5):*

▪ Under the heading "Property Insurance and Taxes" defendant's form provides that "[i]f the collateral is lost or damaged, you can use the insurance proceeds to replace or repair it, or repay my loan." Plaintiff argues that this language effectively gives the bank a security interest in the proceeds of insurance, but has cited no case in support of this assertion. Neither TILA nor Regulation Z specifically defines the type of security interests which must be disclosed. However, *Rounds v. Community Nat'l Bank in Monmouth*, 454 F.Supp. 883 (S.D.Ill.1978), addresses this issue. The court in *Rounds* stated that the security interests which are required to be disclosed include "all provisions which have the effect of imposing a lien upon, or a charge against, the property of a debtor." 454 F.Supp. at 887. Because the discussion in *Rounds* is instructive, it bears quoting at some length.

> [N]ot every interest or benefit running to a creditor is a security interest within the

intendment in the Act and the Regulation. (citation omitted) Both the assignment of unearned premiums and the assignment of insurance proceeds do provide some benefit and protection to the lender. But neither of those provisions subject the debtor's property to any lien or any risk. Rather, the insurance provisions of the agreement are properly construed as being mutually protective of the interests of both the debtor and the creditor. If one must seek a plus side of that mutual equation, the provisions are most protective of the interests of the debtor, inasmuch as he assumed the risk of loss under the contract and his obligation would be ameliorated by the application of either unearned premiums or the proceeds of a claim of loss to the payment or reduction of his obligation.

> It must be concluded that the contract provisions in question did not create security interests within the intendment of the Act and Regulation. The provisions impose no claim against, nor risk to, the plaintiff's assets. If such ephemeral interests are to be deemed to be security interests within the disclosure requirements of the Act, that determination should emanate from Congressional enactment or from a determination of the Board, not from a judicial decree. *Id.* at 888.

In *Mims v. Dixie Finance Corp.*, 426 F.Supp. 627 (N.D.Ga.1976), the issue before the court was whether the creditor was required to disclose as a security interest a clause providing for a waiver and assignment of homestead and exemption rights. The court held that the waiver and assignment did not create a security interest within the meaning of Regulation Z and did not need to be disclosed to the customer. In arriving at this conclusion the court warned that "unnecessary disclosure may violate the Act by obscuring required disclosures." 426 F.Supp. at 638.

In light of the *Mims* and *Rounds* decisions, this Court concludes that the provision in question did not create a security interest within the meaning of TILA and

Regulation Z. Accordingly, plaintiff is not entitled to judgment in his favor as to that issue.

### D. Failure to Disclose Default Charges— 15 U.S.C. § 1639(a)(7) and 12 C.F.R. § 226.8(b)(4):

■ Under the heading "Property Insurance and Taxes" is the statement, "You can insure the collateral or pay any tax if I don't. I will then repay you with the highest interest allowed by law." Plaintiff contends that the failure to pay the insurance premium or to pay taxes on the vehicle is the equivalent of a default, and that repayment at the highest interest allowed by law would amount to a default charge or penalty. The failure to disclose this "default charge," continues plaintiff, is a violation of the statute and Regulation Z.

Again, no supporting cases are cited by the plaintiff, and the Court has been unable to find any decisions addressing this specific issue. However, some light may be shed on the question by ascertaining how similar issues have been resolved. With regard to disclosure of foreclosure costs upon default, Federal Reserve Board Staff Interpretations and case law indicate that only automatically-assessed charges need be disclosed. Federal Reserve Board Staff Interpretation FC–0054 (March 21, 1977) offers the following clarification:

> You ask a further question regarding what charges must be disclosed as default, delinquency, or late payment charges within the context of § 226.-8(b)(4). Specifically, you ask whether attorney's fees and foreclosure costs assessed on a non-automatic basis at the sole discretion of the creditor need to be disclosed pursuant to that section. It is staff's opinion that, if the imposition of these charges is automatic (for example, if the charge becomes immediately due and collectible by virtue of default), the charges must be disclosed under § 226.-8(b)(4). If, however, the imposition of the charge is not automatic but is conditioned upon employment of the services of an attorney to effect collection of ex-

penditure of amounts in conjunction with foreclosure proceedings, such charge need not be disclosed under § 226.8(b)(4). *See also Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976).

The defendant points out that, in practice, the bank never imposes interest at a rate other than the contract rate, since to do so would create myriad accounting problems. As a result, according to defendant, "the highest interest allowed by law" is not an automatically-imposed default charge subject to disclosure. In *Fisher v. Beneficial Finance Co. of Hoxsie*, 383 F.Supp. 895 (D.R.I.1974), a similar question was posed. The plaintiff in *Fisher* noted that the amount of the finance charge was calculated based on the assumption that she would make all her payments punctually, and that a failure to meet her monthly payment obligation would result in an increase in the amount which plaintiff was obliged to pay. She contended that such additional charges, which included only additional interest at the agreed upon rate, were "default, delinquency, or similar charges" required to be disclosed. The court disagreed, saying,

> A default or delinquency charge carries with it the inference that something is being charged to the borrower in addition to the regular payments required under such a loan—a penalty....

If the plaintiff does make her monthly payments when due, she is only required to pay the specified rate of interest on the unpaid balance of the loan to her and nothing more. Plaintiff's contention that "if a payment is even one or two days late the cost of credit is increased" is irrelevant. Section 1639(a)(7) of 15 U.S.C. and Section 226.8(b)(4) of Regulation Z do not purport to require any disclosure whenever the cost of credit is increased by reason of the failure to pay an instalment of a loan when it is due but do require disclosure *only* when the increased cost is due to "default, delinquency, or similar charges payable in the event of late payments". Additional interest at the contracted rate when there is a late payment is neither a penalty nor a "default, delinquency or similar

charge[s] payable in the event of late payments". 383 F.Supp. at 898–99.

Admittedly, the authorities cited are not directly to the point. However, they are sufficiently analogous to aid in the determination of the issue at hand. The borrower has undertaken to pay taxes on the collateral and to insure it. If he defaults on this obligation, his only additional expense is payment of interest at the contractual rate on the defaulted obligation. The Court concludes that this expense is neither a penalty nor a "default, delinquency, or similar charge payable in the event of late payments." The Court therefore finds this argument in support of plaintiff's motion for summary judgment to be without merit.

Thus far, plaintiff has failed to establish any violations of TILA or Regulation Z. The alleged violations which remain to be discussed present more troublesome questions.

E. *Failure to More Conspicuously Print the Terms "Finance Charge" and "Annual Percentage Rate"—§ 226.6(a)* :

■ Regulation Z § 226.6(a) provides that "where the terms 'finance charge' and 'annual percentage rate' are required to be used, they shall be printed more conspicuously than other terminology required by this part . . . ." Most creditors satisfy this requirement by putting the two terms in boldface capital letters, with the other disclosure terminology in normal type, while other creditors print the two key terms in capital letters with the rest of the disclosure in small letters. Clontz, *supra*, ¶ 2.06[1][c] at 2–83. Here, the defendant has printed the two terms in boldface type, but has also printed several other headings in the same boldface type. This, the plaintiff asserts, constitutes a violation of the above-quoted section. *Powers v. Sims and Levin Realtors*, 396 F.Supp. 12 (E.D.Va. 1975). It would appear that the defendant has committed a technical violation of 12 C.F.R. § 226.6(a). However, certain mitigating factors should be noted. While it is true that the two key terms are not more conspicuous than all other required disclosures, they are printed conspicuously. It appears from the face of the contract that there has been no effort to confuse or mislead the consumer or to obscure the terms. Indeed, the consumer would be hard-pressed to overlook the two terms.

F. *The Lender's Home Solicitation Notice —§ 226.6(c)* :

■ A notice appearing in the bottom right-hand corner of the lender's document informs the consumer of his limited right to cancel a home solicitation sale. The plaintiff contends that the placement and type size of the home solicitation notice obscures or detracts attention from the information required to be disclosed. Since the notice constitutes additional information, says plaintiff, it must be delineated from the required disclosures under Regulation Z, 12 C.F.R. § 226.6(c) which provides as follows:

At the creditor's or lessor's option, additional information or explanations may be supplied with any disclosure required by this part, but none shall be stated, utilized, or placed so as to mislead or confuse the customer or lessee or contradict, obscure, or detract attention from the information required by this part to be disclosed. Any creditor or lessor who elects to make disclosures specified in any provision of State law which, under paragraph (b) of this section, is inconsistent with the requirements of the Act [section 1601 et seq. of this title] and this part may

(1) Make such inconsistent disclosures on a separate paper apart from the disclosures made pursuant to this part, or

(2) Make such inconsistent disclosures on the same statement on which disclosures required by this part are made; provided:

(i) All disclosures required by this part appear separately and above any other disclosures,

(ii) Disclosures required by this part are identified by a clear and conspicuous heading indicating that they are made in compliance with Federal law, and

(iii) All inconsistent disclosures appear separately and below a conspicuous demarcation line, and are identified by a clear and conspicuous heading indicating that the statements made thereafter are inconsistent with the disclosure requirements of the Federal Truth in Lending Act.

*LaGrone v. Johnson*, 534 F.2d 1360 (9th Cir. 1976), cited by plaintiff, lends some support to his contention. Although the court did not reveal the nature of the additional information, it emphasized that, if lenders were allowed to include additional information in any form they wish, unsophisticated consumers would be handicapped in making ready comparisons.

The Court finds it rather ironic for plaintiff to complain about the home solicitation notice, since that notice informs the consumer of an important right (though not pertinent here)—the right to cancel within three business days any sale solicited at his residence. The defendant protests, with some justification, that since the notice is required by state law, it is effectively being whipsawed between conflicting state and federal regulations. The Court would be more favorably impressed by plaintiff's argument if the additional information objected to was deceptive in some way or was mere boiler plate.

### G. *Failure to Print All Disclosures on One Side of One Page—§ 226.8(a)*:

█ Regulation Z § 226.8(a) provides in pertinent part that "[a]ll of the disclosures shall be made together on either: (1) the note or other instrument evidencing the obligation on the same side of the page and above the place for the customer's signature; or (2) one side of a separate statement which identifies the transaction." The plaintiff maintains that defendant has violated the provision by placing the prepayment penalty charge and the delinquency charge disclosures on the back of the disclosure statement. The Court's attention is directed to two Ninth Circuit decisions, *Ljepava v. M.L.S.C. Properties, Inc.*, 511 F.2d 935 (9th Cir. 1975) and *LaGrone v.*

*Johnson, supra.* However, neither of these cases is completely apposite to the instant case. In *Ljepava*, the section of the disclosure statement dealing with calculation of charges for late payment said simply "Refer to note." The court was quick to point out that there were ten promissory notes involved in the transaction. "The whole purpose of the Truth in Lending Act is to provide meaningful disclosure to a borrower. Such a goal is not met if the borrower must examine several documents to learn the terms of the loan agreement." 511 F.2d at 942. Likewise, in *LaGrone* the acceleration clause was disclosed in the note itself but not in the disclosure statement. Citing *Ljepava*, the court held that disclosure in the note was insufficient. If it can be said that the defendant violated the letter of § 226.8(a), certainly it must be conceded that the violation was not as egregious as in the *Ljepava* and *LaGrone* cases. Plaintiff Dixey was not required to examine any other documents, only the reverse side of the disclosure statement. Additionally, a notice is printed on the front side of the disclosure statement directing the consumer to see the reverse side for important information.

Both parties have referred to Official Federal Reserve Board Interpretation § 226.801 which discusses the permissibility under § 226.8(a) of using the reverse side of the disclosure statement.

Some creditors incorporate the terms of a contract, a security agreement, and evidence of a transaction in a single document. These documents are designed for processing by mechanical and electronic equipment. If all of the required disclosures under § 226.8 should be placed on the face of such a document, the creditor will be unable to utilize conventional accounting and recordkeeping equipment because of the size of the resulting document. The question arises as to whether required disclosures may be made on the face and the reverse side of such a document.

Where a creditor elects to combine disclosures with the contract, security agreement, and evidence of a transaction in a

single document, the disclosures required under § 226.8 shall, in accordance with § 226.6, be made on the face of that document, on its reverse side, or on both sides, provided that the amount of the finance charge and the annual percentage rate shall appear on the face of the document, and, if the reverse side is used, the printing on both sides of the document shall be equally clear and conspicuous, both sides shall contain the state, "NOTICE: See other side for important information," and the place for the customer's signature shall be provided following the full content of the document.

The amount of the finance charge and the annual percentage rate appear on the face of defendant's disclosure statement, and the printing on both sides is equally clear and conspicuous. Thus, the defendant lender's form clearly satisfies those two requirements. However, the interpretation is somewhat confusing with respect to the signature requirement because of the ambiguity of the phrase "following the full content of the document." It is unclear whether a signature on the reverse side is required if any disclosure appears there or whether references to the back from the front and then to the front from the back result in the full content appearing on the front. *Sanders v. Auto Associates, Inc.*, 450 F.Supp. 900 (D.S.C.1978). If the latter explanation is correct, then the only manner in which the lender has failed to comply with the official interpretation is by omitting the notice on the reverse side to important information contained on the face of the document. This would amount to an extremely technical violation, at best. If a notice is placed on the face of the document referring to important disclosures on the reverse side, a customer will either choose to study the reverse side or choose to disregard it. It is highly doubtful that placement of an identical notice on the reverse side will increase the likelihood that the customer will even review the reverse side of the document.

Plaintiff points to yet another manner in which defendant has failed to heed the instructions in Official Interpretation § 226.-801. The interpretation directs lenders to place notices on both sides of the document saying "See other side for important information." Plaintiff then observes, with considerable perception, that defendant's form says, "See *reverse* side for important information." This, claims the plaintiff, amounts to a violation of the above-quoted interpretation. Attempts to recover a substantial penalty which are based on such hypertechnical faultfinding will not be countenanced by this Court.

## III. CONCLUSION

It appears, with respect to the final three allegations discussed (failure to print the two key terms more conspicuously, improper placement of the home solicitation notice, and failure to print all disclosures on one side of one page) that the defendant has failed to completely comply with TILA and Regulation Z. Admittedly, many courts have allowed recovery based on mere technical violations of the statute and regulations. Increasingly, however, courts and commentators have become wary of the injustice which can result upon an inflexible application of the provisions of the Act.

Judge Ward, in *Dalton v. Bob Neill Pontiac, Inc.*, 476 F.Supp. 789 (M.D.N.C.1979) surveys some of the criticisms levelled at TILA. One court has observed that " 'the obvious intent of Congress was to set standards by which to achieve meaningful "truth-in-lending" and not to deviously set traps by which windfalls could be reaped by fanciful lawyers.' " *Andrucci v. Gimbel Brothers, Inc.*, 365 F.Supp. 1240, 1243 (W.D.Pa.1973) *aff'd* 505 F.2d 729 (3rd Cir. 1974). Another court has remarked that "[i]t appears to be all too easy, in the light of some reported cases, for courts to abdicate the realm of reality . . . . [C]ourts should not condone or give credence to suits which attempt to subvert the Act into an instrument of harassment and oppression of the lending industry." *Sharp v. Ford Motor Credit Co.*, 452 F.Supp. 465, 468 (S.D.Ill. 1978). Judge Ward, in *Dalton, supra*, offers this comment regarding TILA:

If this Court were to impose the statutory penalties, Dalton would receive $577.84 for defendant's failure to itemize a $4.00 fee, and the Lowerys would receive $2,000.00 for defendant's failure to itemize $17.75 in fees! Such a result would be shocking and contrary to settled notions of fairness and equity. The large penalties have no reasonable correlation with the extremely minor and technical violations.... Whether the license and title fees were correctly itemized had no effect on plaintiffs' decisions to purchase the automobiles or to finance them through the defendant. By these lawsuits, the plaintiffs simply seek a windfall.

The Truth-in-Lending Act has a laudible purpose: to allow consumers to become more knowledgeable and informed in their use of credit. With knowledge comes fairer treatment of the consumer. However, the Act becomes tarnished when it is used to reach a flagrantly inequitable result. The cases presently before the Court are excellent examples of how the Act can be abused. They are also examples of how the Act and Regulation Z set themselves up for abuse and how they can hinder the ends of justice. Any law which allows such result should be re-examined. 476 F.Supp. at 797–98.

Some commentators have been critical of the results obtained by strict construction of TILA, as is exemplified by the following statement:

Truth-in-Lending was a well-intended statute. Unfortunately, it seems to serve mostly as a trap for the unwary creditor, increasing the cost of credit extensions and eliminating the small credit extender from the market as opposed to achieving benefits for the consumer on whose behalf it was enacted. Consumers have gotten windfalls because of creditors' errors, some of which were unintentional and meaningless. This is not exactly the policy of benefiting consumers attributed to Congress when it enacted this legislation. J. Edmonds and G. Taylor, *Truth and Consequences*, 35 Wash. & Lee L.Rev. 367, 391 (1978).

Perhaps the most forceful critic is Judge Chapman of the United States District Court for the District of South Carolina. In *Wilson v. Allied Loans, Inc.*, 448 F.Supp. 1020, 1022–23 (D.S.C.1978), Judge Chapman made the following observation, much of which is relevant to the instant case:

Despite the fact that this Court feels compelled by the statutes and regulations to award the plaintiff the penalty established by the Truth in Lending Act, this *result is absurd in light of the realities of this case. This barratrous legislation transforms loan documents into contest puzzles in which prizes are awarded to those who can uncover the technical defects.* Unfortunately, these prizes are not paid by the sponsor of the contest, the government, but by finance companies who attempt to make a fair profit by loaning money while at the same time trying to insure that the loans will be repaid. They must necessarily use form documents which are sufficiently flexible to cover a wide variety of situations presented by both consumer and commercial loans. A penalty is imposed on the defendant in this case even though it has acted in good faith and despite the fact that plaintiff has sustained no damages. The violation in this case results from a minor technicality which arises from the operation of the 10 day rule relating to after-acquired security interests in consumer goods. The 10 day interest acquired was surely unwanted by the defendant, unimportant to the plaintiff, and unexpected by both parties. It gave no meaningful security to the defendant and its full disclosure to the plaintiff would undoubtedly have had no effect on plaintiff's decision to obtain the loan from the defendant. (emphasis added)

In a later case, *Sanders v. Auto Associates, Inc.*, 450 F.Supp. 900 (D.S.C.1978), Judge Chapman adopted the following approach, which appears eminently sensible:

Unfortunately, many of the truth in lending cases which have been instituted in this court have not been brought by plaintiffs who were misled or misin-

formed by the loan forms they attack. These plaintiffs have merely sought a windfall penalty from a lender by picking apart its loan form word by word in search of a technical deviation from the language of the statutes and regulations. The Truth in Lending Act was never meant to make the district courts forums for word games between lenders and borrowers in which a borrower's attorney who is adept at using legalese and arguing technicalities is awarded a prize for himself and his client. *In order to avoid such misuse of the Truth in Lending Act, this Court will strongly construe its provisions against borrowers who were not misled by a lender's disclosure but merely seek a penalty for finding a technical problem with the loan form which could not have conceivably influenced his choice of credit.* 450 F.Supp. at 902. (emphasis added)

Apparently, even the Federal Reserve Board, the body responsible for implementing Regulation Z, has not been entirely pleased with the results which have attended rigid application of TILA and Regulation Z. In its annual report to Congress for the year 1976, the Board noted some criticisms of the TILA:

During the nearly 7 years that the Truth in Lending Act has been in effect, the Board has become aware of considerable criticism of the Act and of Regulation Z because of their complexity. Critics have argued not only that the numerous technical disclosures are burdensome for creditors but also that the disclosure statement is so lengthy and complicated that most consumers do not bother to read it. The criticism concludes that, in attempting to give consumers all the meaningful information they need to make an informed credit decision, Truth in Lending legislation has gone too far and, in many cases, has only confused consumers with extraneous information not directly related to the costs of credit.

The Board has been concerned with the complexity of the Act and of Regulation Z for some time and has, in the past, made recommendations aimed at simplification of the Act's disclosure requirements. The Board feels that continued attention to simplification efforts is desirable. Simplification benefits both consumers and creditors by lessening the burden of disclosure while making those disclosures that are required more meaningful to the average consumer. Federal Reserve Board Recommendations to Congress, from Annual Report to Congress on Truth in Lending for the year 1976 by the Board of Governors of the Federal Reserve System, CCH Cons. Cred. Guide, pamphlet issue No. 434, part II, Appendix C, at 37 (Jan. 28, 1977).

Two years later, the Board made this admission:

Amendments to the Truth in Lending Act, and interpretations by the courts, have made compliance increasingly difficult. Also, Regulation Z, in providing detailed guidance to creditors, has introduced its own complexity to Truth in Lending. Concerns have arisen about the intelligibility and usefulness of current Truth in Lending disclosures to the average consumer, as well as about the possibility that excessive complexity is indirectly increasing the cost of credit to consumers. Annual Report to Congress on Truth-in-Lending for the year 1978 by the Board of Governors of the Federal Reserve System, CCH Consumer Credit Guide, pamphlet, issue No. 539, part II, at 1 (Jan. 25, 1979).

The Federal Reserve Board has also expressed concern that a defendant may be held liable for purely technical, minor violations:

Much of the present complexity of the Act and Regulation Z reflects the impact of the civil liability considerations. The threat of *severe penalties for relatively minor technical violations* has led many creditors to seek greater certainty by requesting official Board amendments and interpretations, which further complicate the regulation. Although private causes of action provide an important enforcement tool for the Act, the Board believes that Congress should carefully review the

present civil liability provisions to determine whether modification in them might reduce needless litigation and the resulting regulatory complications.

. . . . .

[T]he Board urges that Congress also study the possibility of *limiting the penalty provisions* of the statute to violations that actually interfere with the consumer's ability to make meaningful comparisons of credit terms. Only a limited number of terms seem to be genuinely helpful in this regard. These probably include the annual percentage rate, the finance charge, the amount financed, and the repayment schedule. It may be that *civil liability should be incurred only for material misstatements of these terms,* leaving technical violations to be dealt with by administrative remedies. *Under present law a creditor may be penalized for purely technical violations of which the consumer may have been unaware at the time and which in no way entered into the decision to accept or reject the credit terms offered. This situation lends itself to abuse and has overburdened some courts with Truth in Lending litigation.* Federal Reserve Board Letter to Congress on Recommendations for Amendments of Truth-in-Lending Act (dated July 16, 1976), CCH Consumer Credit Guide, pamphlet, issue No. 434, part II, appendix D, at 39 & 40 (Jan. 28, 1977) (emphasis in original)

This Court must now decide whether it will impose liability on the defendant for the minor, technical violations. (It bears noting that plaintiff, in his brief, has conceded that some of the alleged violations are technical.) It is true that a great number of courts have indicated that, once a technical violation has been shown, the court is without discretion to refuse to award damages. However, other courts have held, or intimated, that equitable considerations are not irrelevant, and that a court does have discretion regarding the imposition of damages. For example, in *Jumbo v. Nestor Motors, Inc.,* 428 F.Supp. 1085 (D.Ariz.1977) the seller had failed to furnish to the buyer a copy of the security agreement on the date that the buyer executed the agreement. The court cited testimony indicating that the defendant's failure had not prevented the meaningful disclosure of credit terms. As a result, the court determined that civil liability should not be imposed. The plaintiffs in *Andrucci v. Gimbel Brothers, Inc.,* 365 F.Supp. 1240 (W.D.Penn.1973) alleged that the defendant had failed to comply with § 226.6(c) of Regulation Z dealing with disclosure of inconsistent state law. The defendant had disclosed the state minimum monthly charge on its forms (70 cents) but had not disclosed the federal minimum monthly charge (50 cents). The court held that the inconsistency was "clearly *de minimis,*" 365 F.Supp. at 1244, and granted summary judgment for defendant. In a Ninth Circuit decision, *Eby v. Reb Realty, Inc.,* 495 F.2d 646 (9th Cir. 1974), the issue, not present in this case, concerned the appropriateness of awarding the plaintiff damages in addition to enforcing his right to rescind. The Court of Appeals determined that the remedies were not exclusive, saying that although

> sections 1635 and 1640 do not set forth exclusive remedies, we do not say that a court must always grant both forms of relief when requested. These two separate provisions can result in a sometimes harsh penalty. In the absence of any clear congressional statement, we think a request for both forms of relief is addressed to a court's sense of equity and may properly be denied in appropriate cases. Here, though, the district court did not abuse its equitable discretion. Its judgment is, therefore, affirmed. 495 F.2d at 652.

The cited cases indicate that a court is not divested of its discretion or of its "sense of equity" upon entering the field of consumer credit regulation.

In the instant action, there is absolutely no indication that the lender has sought to mislead or confuse the consumer, or to obscure important disclosures. On the contrary, an examination of defendant's form

reveals a sincere effort on the part of the bank to breathe life into TILA. The lender has attempted to eliminate legalese, and to make the disclosures in a manner understandable to the average consumer. It should be noted that the defendant's form contains the disclosures required by the regulations and case law. Plaintiff's objections center more around the improper size or placement of certain items. Furthermore, there is no indication in the record that plaintiff suffered any actual damage or that the technical violations in any way influenced his decision to do business with the defendant. The failure to dot an "i" or cross a "t", figuratively speaking, often has little to do with the fairness or clarity of a given form.

The Court is satisfied that the approach adopted by Judge Chapman in *Sanders* is most likely to serve the ends of justice. Accordingly, this Court will liberally construe the disclosure requirements in favor of borrowers who were misled or might have been misled by a confusing or incomplete form. Similarly, the Court will construe the provisions of TILA against borrowers who were not misled, but merely seek a windfall for finding a technical defect in the form which could not conceivably have influenced his choice of credit. *Sanders, supra,* 450 F.Supp. at 902. Courts should not be constrained to interpret a law in such a technical, unyielding manner that the Court is ultimately unable to achieve substantial justice for the parties before it. The notion that judges should mete out the sort of procrustean justice advocated by counsel for plaintiff is repugnant to this Court.

The Court is not persuaded that the technical defects in defendant's form prevented the plaintiff from making a meaningful comparison of credit terms. Such being the case, it appears that the disclosure statement in question accomplishes the objectives of TILA set out in 15 U.S.C. § 1601(a). Since there is no evidence in the record that plaintiff was misled or confused by the minor flaws in defendant's form, the Court construes the provisions of TILA

against the consumer. Plaintiff has failed to show a lack of compliance in any respect entitling him to judgment as a matter of law. Consequently, the Court concludes that plaintiff's motion for summary judgment is not well taken and should be denied. In appropriate cases, summary judgment may be entered against the moving party, Wright & Miller, *Federal Practice and Procedure: Civil* § 2720 (1973), and this is such a case. It appears that the allegations of the complaint are without merit, that there is no genuine issue of material fact, and that the defendant, Idaho First National Bank, is entitled to judgment as a matter of law.